GEORGE ELLIS, Appellee, v. JOURNEYMEN BARBERS' INTERNATIONAL UNION OF AMERICA et al., Appellants.

INJUNCTION: Subjects of Protection and Relief—Unlawful Labor
1 Boycott. Injunction will lie to restrain a labor union and its employees from maintaining in front of a place of business, and during business hours, a picket who, by banner and by word of mouth, proclaims the ''unfairness'' to organized labor of the place of business picketed, and who, by said means, seeks to (and to a substantial degree does) coerce or induce the public to withdraw its patronage from said place of business, with the avowed or proved purpose on the part of said union and its employees ultimately thereby to force the owner of the business either .to close his place of business or to charge the public for services the scale of prices specified by the union. Especially is this true when the conduct of the picket borders, at times, upon breach of the peace.

INJUNCTION: Actions—Defense in re Unlawful Boycott. It is no de-
2 fense to an action to enjoin an *unlawful* boycott that the plaintiff (against whose place of business the boycott is sought to be maintained) is a member of the labor organization which seeks to main-tain the boycott.

INJUNCTION: Actions—Dismissal of Nonparticipating Defendants.
3 In an action to enjoin the unlawful picketing of a place of business, the court should dismiss party defendants who, while doubt-

less in sympathy with the boycott, are not, by financial aid or otherwise, maintaining it.

*Appeal from Woodbury District Court.*—W. G. SEARS, Judge.

DECEMBER 15, 1922.

SUIT in equity, to enjoin the defendants from boycotting the plaintiff's place of business, and from maintaining pickets in front thereof for the purpose of such boycott. There was a decree for plaintiff, enjoining certain of the defendants. Other defendants were dismissed by the decree, as being guilty of no wrongdoing. The enjoined defendants appeal. Plaintiff later appeals from that part of the decree dismissing certain of the defendants.—*Affirmed on both appeals.*

*Free & Pickus,* for appellants.

*Snyder, Gleysteen, Purdy & Harper,* for appellee.

EVANS, J.—I. The principal defendants are the Journeymen Barbers' International Union of America, Local Union No. 52, and the officers thereof. A group of other defendants are named who were not officers or members of the

1. INJUNCTION: subjects of protection and relief: unlawful labor boycott.

above named "Union," but who were charged in the petition with conspiracy with the first named defendants, and with aiding and abetting such defendants in carrying on an unlawful boycott by means of picketing against the plaintiff's place of business. This group was dismissed by the decree of the trial court. The plaintiff is a barber by trade and by actual occupation. The first named defendant is a trade union of journeymen barbers. The membership of this trade union comprises journeymen barbers only, and not employing or master barbers. The plaintiff is an employing barber: that is to say, he owns a shop in which he himself works at the chair, and in which also he employs two or three journeymen barbers. The plaintiff was formerly a journeyman barber, and was a member of the defendant "Union." Upon becoming an employing barber, he was required, under

the rules, to retire from the defendant "Union." Pursuant to the rules, the "Union" issued to him a "retiring card," which recognized his former membership and his right to be reinstated at any future time when he should cease to be an employing barber and should again become a journeyman barber. Under such retiring card, he entered into a contractual relation with the "Union," whereby he agreed to maintain a union shop and to observe all the rules and regulations of the "Union." This was the affiliation which the Union sustained toward all the employing barbers who maintained union shops. So far as these shops were concerned, therefore, this defendant Union dominated all the rules and regulations and scale of prices in force therein. Under this affiliation, the plaintiff operated his shop for one year. During this period of time, he employed as his assistants Carl Stone and one Newell, who were members of the defendant "Union." Under the union regulations, the journeyman barber took 65 per cent of the earnings of his chair, and had a guaranty of $25 per week. The scale of prices fixed by the union was such as was in force during the period of war prices. The plaintiff became convinced that the scale of prices was too high for his particular trade, which was made up largely of laboring men; and that the hours permitted by union regulations were too short. He determined, therefore, to reduce the prices and to extend the hours. This course was approved and agreed to by his employees. On November 30, 1920, therefore, he purported to withdraw from the defendant "Union" by sending in his card, which had been theretofore posted in his shop as a declaration that it was a union shop, and put in effect his reduced prices and lengthened hours. The result was that his union employees were induced to leave him, and that pickets were established forthwith in front of his shop. These pickets were two in number, one relieving the other. One of these pickets was Carl Stone, plaintiff's employee, who was employed as picket by the defendant Union, at a wage of $30 per week. The picket wore upon his person a banner or poster, which extended from his toes to his head and from his head to his heels, and which contained on front and back this inscription: "This place is unfair to Organized Labor. Journeymen Barbers No. 52." In the center of this garment or banner there

was a hole, through which the picket's head protruded. The colors adopted were red and white. The picket walked back and forth throughout the business hours upon the sidewalk in front of plaintiff's place of business. His designated place upon the sidewalk was near the curb. He was instructed by the defendants not to talk. This instruction, however, was not observed. After the departure of his employees, the plaintiff obtained additional help. The conceded purpose of the picketing was to dissuade customers from going into plaintiff's shop. The picket not only displayed the banner, but did also by word of mouth attempt to dissuade customers from entering. That such attempt was to a substantial degree successful, is sufficiently proved. It was the announced purpose of the defendant to maintain such picketing until the plaintiff should either maintain the regulations and prices specified by the Union order or close his shop. Some harsh altercations of speech occurred between the picket and the employees of the plaintiff. These altercations bordered, at least, upon a breach of the peace.

The foregoing is, perhaps, a sufficient indication of the general nature of the case, for the purpose of determining the rules of law applicable thereto. It will be noted that this is not a case of conflict between capital and labor or between employer and employee. It is not a strike for higher wages. Plaintiff paid the union scale of *wages*. The employees had no grievance. They had agreed in advance to the course adopted by plaintiff. It is simply a case where a powerful organization and its officers bring its power to bear upon an ordinary individual, who is seeking to engage in and to carry on legitimately a humble business in his own way. There is a fair field of competition and of persuasion and of publicity wherein the defendant may lawfully bring to bear such power. There is also a limitation upon the defendant in that regard, beyond which it may not lawfully go. The method adopted in this case presents a clear case of attempted boycotting, both primary and secondary. The purpose of a *secondary* boycott is to bring to bear a duress upon the customers of the person under attack, by threatening them directly or indirectly with a boycott, if they persist in trading with such person. One evident purpose of maintaining a picket, rather than to display mere banners upon standards, is to make

observation and discovery of the identity of the persons who persist in trading with the plaintiff, in defiance of defendant's warning. This is the impression naturally created upon the minds of customers. That some of the customers were thus intimidated in this case is shown. The law puts no limit upon the right of defendant to exercise fair persuasion through publicity, but it cannot countenance any display that is the equivalent of force and intimidation, or of a disturbance of the peace, or of aggressive interference with the right of peaceful ingress and egress to and from the plaintiff's shop. Force *threatened* is the equivalent of force exercised, because it amounts to intimidation and duress in either event. Aggressive picketing has been quite uniformly denounced by the courts, including the United States Supreme Court. Such court has held that "peaceful picketing" is a contradiction in terms. *Truax v. Corrigan,* 42 Sup. Ct. Rep. 124. Picketing is usually an invitation to violence. Where it is persisted in, with a declared purpose to continue until its victim is destroyed, it is a *challenge* to violence, of the most effective kind. It is not in normal human nature to submit to it, except under the duress of superior force. The following excerpts from some of the authorities may be deemed a sufficient discussion of the state of the law on this subject.

"Yet they [the courts] have very generally condemned those combinations usually called 'boycotts,' which are formed for the purpose of interfering, otherwise than by lawful competition, with the business affairs of others, and depriving them, by means of threats and intimidation, of the right to conduct the business in which they happen to be engaged according to the dictates of their own judgments. * * * The members of the combination undertook to prescribe the manner in which the plaintiff company should manufacture barrels and casks, and to enforce obedience to its orders by a species of intimidation, which is no less harmful than actual violence, and which usually ends in violence. The combination amounted, therefore, to a conspiracy to wrongfully deprive plaintiff of its right to manage its business according to the dictates of its own judgment." *Hopkins v. Oxley Stave Co.,* 83 Fed. 912.

"They were endeavoring to compel the complainants to submit to their dictation by depriving the complainants of their

legal right to employ such laborers as they might choose. If there is a combination to injure a person because he refuses to comply with some demand where he has a legal right to refuse, there is no way of classifying acts in furtherance of such purpose as competition. The acts alleged in the bill were directed primarily against the complainants for the purpose of doing them harm, and that sort of action is not lawful competition. * * * This is not the case of one laborer seeking to obtain the place of another by offering better services or better terms, which would be competition, nor the case of an employer hiring one laborer away from another because he desires the services of such laborer; but there were offers to pay money and transportation and to maintain laborers in idleness, for which defendants would receive nothing, and injury would be inflicted on the complainants. Under the meaning given to the word 'competition' in the case last referred to, the complainants and defendants were not in competition in any sense, and there could be no justification of defendants' acts on that ground. The whole scheme as set out in the bill was to injure the complainants for the purpose of compelling them to yield to the union their absolute legal right to manage their own business in their own way." *Barnes & Co. v. Chicago Typographical Union*, 232 Ill. 424 (83 N. E. 940).

"It is now plain that the paramount motive actuating all the proceedings of the defendants and their fellow members was, by means of the strike, to force the plaintiff to employ only union men on all of its 'outside work,' under the penalty, if compliance was refused, that full performance of the contract with Crane would be seriously embarrassed, if not rendered impossible, while its name would be published by the union in the labor market and among architects and contractors for its products as an employer of nonunion labor, making the obtainment of future contracts and the necessary union labor exceedingly precarious, if not practically impossible. The right of the plaintiff to the benefit of its contract and to remain undisturbed by the union during performance, as well as to hire and retain such employees as it might select, unhampered by the interference of the union, acting as a body, through the instrumentality of a strike or of a secondary boycott or black list, is a primary

right, which has not been abrogated by any of our decisions. 'An intentional interference with such a right, without lawful justification, is malicious in law, even if it is from good motives and without express malice.' " *Snow Iron Works v. Chadwick*, 227 Mass. 382 (116 N. E. 801).

"Conduct directly affecting an employer to his detriment, by interference with his business, is not justifiable in law, unless it is of a kind and for a purpose that has a direct relation to benefits that the laborers are trying to obtain. Strengthening the forces of a labor union, to put it in a better condition to enforce its claims in controversies that may afterwards arise with employers, is not enough to justify an attack upon the business of an employer by inducing his employees to strike." *Folsom v. Lewis*, 208 Mass. 336 (94 N. E. 316).

"From these decisions it will be gathered that the boycott, as generally understood, is a combination to harm one person by coercing others to harm him. The combination in this case, in our opinion, not only answers this definition of a boycott, but also the definition previously given of a common-law conspiracy. The immediate purpose and result of this combination, as we have seen, was to interfere with complainant's lawful business, and to deprive complainant and its customers of their right to trade intercourse. It matters not that the remote object of the combination was to benefit such members of the local unions as should be employed by complainant, because the law looks to the immediate, and not to the incidental, object of the combination. If the immediate object is unlawful, the combination is unlawful. If the immediate object is lawful, as in the case of legitimate trade competition, including strikes, the combination, generally speaking, is lawful. This distinction will be found in the cases cited. That no physical coercion was practiced in this case does not alter our conclusion, since restraint of the mind, as the evidence in this case clearly demonstrates, is just as potent as a threat of physical violence." *American Fed. of Labor v. Buck S. & R. Co.*, 32 L. R. A. (N. S.) 748.

"Contracts of this character, containing provisions designed to unionize an entire industry in a territory as large as Hudson County, do not appear to have come directly before our courts for consideration, except as hereinafter mentioned. In other

jurisdictions where they have been involved, they have uniformly been held to be illegal, as against public policy. * * * The illegality of such contracts is pronounced upon the fundamental principles of our theory of government, to which monopolies of any kind affecting in any way the utmost freedom of the individual to pursue his lawful trade or business are abhorrent.  As was said in *Folsom v. Lewis,* supra: 'The law condemns all combinations, whether in respect of labor or of so-called capital, which seek to become monopolies and thus oppressive to the people.' " *Baldwin Lbr. Co. v. Local No. 560,* 91 N. J. Eq. 240 (109 Atl. 147).

"The plaintiff and the defendants are at issue on the legality of a strike to limit the number of apprentices. But both the plaintiff and the defendants agree that a strike to unionize an employer's shop is an illegal strike, and that a strike for an increase in wages is a legal strike. Without question, a strike for both a legal and an illegal purpose is an illegal strike, and no contention has been made to the contrary." *Baush Mach. Tool Co. v. Hill,* 231 Mass. 30 (120 N. E. 188).

"It must be understood, however, that these associations, like other voluntary societies, must depend for their membership upon the free and untrammeled choice of each individual member. No resort can be had to compulsory methods of any kind, either to increase, keep up, or retain such membership. Nor is it permissible for associations of this kind to enforce the observance of their laws, rules, and regulations through violence, threats, or intimidation, or to employ any methods that would induce intimidation or deprive persons of perfect freedom of action." *Longshore Ptg. Co. v. Howell,* 26 Ore. 527 (38 Pac. 547, 28 L. R. A. 464).

"The question whether picketing is a peaceful and lawful means [of presenting the cause of strikers to the public] is one that has also received frequent judicial consideration. The cases in different jurisdictions are not harmonious upon the question. Some of the courts have recognized, or at least do not deny, that picketing may not be unlawful. The weight of authority, however, and the growing tendency, is to accept the contrary view, and to regard picketing as inherently illegal, for the reason that it is inseparably associated with acts that are

indisputably illegal. Accordingly, it has been held that there is no such thing as peaceful picketing, any more than there could be peaceful mobbing." *Rosenberg v. Retail Clerks' Assn.*, 39 Cal. App. 67 (177 Pac. 864).

"It is urged that, because petitioner stationed himself at this place and said nothing and did no overt act of interference, that his acts, if found to be picketing, were lawful. Such a contention is supported by many authorities. The later and more reasonable rule, however, holds that all picketing is illegal. 'The doctrine that there may be a moral intimidation which is illegal, announced by the Supreme Court of Massachusetts, was among the first judicial steps taken in this country toward overturning the rule permitting peaceable picketing * * * and was a forerunner of the later rule that there can be no such thing as peaceable picketing, and consequently that all picketing is illegal.' 24 Cyc. 836, citing *Vegelahn v. Guntner*, 167 Mass. 92 (44 N. E. 1077, 35 L. R. A. 722, 57 Am. St. Rep. 443) ; *Franklin Union v. People*, 220 Ill. 355 (77 N. E. 176, 4 L. R. A. [N. S.] 1001, 110 Am. St. Rep. 248) ; *Atchison T. & S. F. R. Co. v. Gee* (C. C.), 139 Fed. 582; *Beck v. Protective Union*, supra." *In re Langell*, 178 Mich. 305 (144 N. W. 841).

"The idea upon which picketing by any means cannot be sustained is that it intimidates the public from entering into the place, and doing business with a person before whose store or place of business a line of guards is stationed. Where a line of guards, consisting of one or more, is stationed in front of a place of business, everyone knows that such guard is there for the purpose of intimidating and preventing the public from dealing with the person whose place of business is picketed. That this is contrary to the spirit of our institutions and the right to conduct a lawful business in a lawful way, without molestation of other persons, needs no argument to sustain it." *St. Germain v. Bakery & C. W. Union*, 97 Wash. 282 (166 Pac. 665).

"The patrol was an unlawful interference both with the plaintiff and with the workmen, within the principle of many cases; and, when instituted for the purpose of interfering with his business, it became a private nuisance." *Vegelahn v. Guntner*, 167 Mass. 92 (44 N. E. 1077).

The authorities mainly relied upon by appellants are the cases of *Steffes v. Motion Picture Mach. Union*, 136 Minn. 200 (161 N. W. 524), and *Truax v. Bisbee Local Union*, 19 Ariz. 379 (171 Pac. 121). It is contended that the first cited case is "on all fours" with the case at bar. If that were correct, we should deem the opinion quite out of harmony with the great weight of authority. However, we do not deem the case "on all fours" with the case at bar. Moreover, the later pronouncement of the Minnesota court, as found in *Roraback v. Motion Picture Mach. Union*, 140 Minn. 481 (168 N. W. 766), is in substantial harmony with the authorities above cited, so far as applied to the facts of the case at bar. In the *Truax* case, the opinion of the Supreme Court of Arizona was based upon a statute which in express terms forbade the issuance of an injunction in cases of this kind. The case went on appeal to the Supreme Court of the United States. Since appellant's argument was written, that court has handed down a reversing opinion, which not only holds picketing of the character here under consideration as unlawful, but overrules the Arizona statute, as being in conflict with the Constitution of the United States. The following excerpts from the opinion of the United States Supreme Court in that case will be sufficiently indicative of its holding:

"Plaintiffs' business is a property right (*Duplex Ptg. Press Co. v. Deering*, 254 U. S. 443, 465), and free access for employees, owner, and customers to his place of business is incident to such right. Intentional injury caused to either right or both by a conspiracy is a tort. Concert of action is a conspiracy, if its object is unlawful or if the means used are unlawful. *Pettibone v. United States*, 148 U. S. 197, 203; *Duplex Ptg. Press Co. v. Deering*, supra. Intention to inflict the loss and the actual loss caused are clear. The real question here is: Were the means used illegal? The above recital of what the defendants did can leave no doubt of that. The libelous attacks upon the plaintiffs, their business, their employees, and their customers, and the abusive epithets applied to them, were palpable wrongs. They were uttered in aid of the plan to induce plaintiffs' customers and would-be customers to refrain from patronizing the plaintiffs. The patrolling of defendants immediately in front of the restaurant on the main street and within five feet of plaintiffs'

premises continuously during business hours, with the banners announcing plaintiffs' unfairness, the attendance by the picketers at the entrance to the restaurant and their insistent and loud appeals all day long, the constant circulation by them of the libels and epithets applied to employees, plaintiffs, and customers, and the threats of injurious consequences to future customers, all linked together in a campaign, were an unlawful annoyance and a hurtful nuisance in respect of the free access to the plaintiffs' place of business. It was not lawful persuasion or inducing. It was not a mere appeal to the sympathetic aid of would-be customers by a simple statement of the fact of the strike and a request to withhold patronage. It was compelling every customer or would-be customer to run the gauntlet of most uncomfortable publicity, aggressive and annoying importunity, libelous attacks, and fear of injurious consequences, illegally inflicted, to his reputation and standing in the community. No wonder that a business of $50,000 was reduced to only one fourth of its former extent. Violence could not have been more effective. It was moral coercion by illegal annoyance and obstruction, and it thus was plainly a conspiracy. It would consume too great space to refer to the mass of authority which sustains this conclusion. It is sufficient to cite the general discussion of the subject in *Loewe v. Lawlor*, 208 U. S. 274, * * *. Well known decisions on similar facts are *Sherry v. Perkins*, 147 Mass. 212; *Barr v. Essex Trades Council*, 53 N. J. Eq. 101; *Purvis v. Local No. 500*, 214 Pa. 348; *Wilson v. Hey*, 232 Ill. 389; *Casey v. Cincinnati Typographical Union*, 45 Fed. 135; *Pierce v. Stablemen's Union*, 156 Cal. 70. * * * It is to be observed that this is not the mere case of a peaceful secondary boycott, as to the illegality of which courts have differed and states have adopted different statutory provisions. A secondary boycott of this kind is where many combine to injure one in his business by coercing third persons against their will to cease patronizing him, by threats of similar injury. In such a case, the many have a legal right to withdraw their trade from the one; they have the legal right to withdraw their trade from third persons; and they have the right to advise third persons of their intention to do so, when each act is considered singly. The question in such cases is whether the moral coercion exercised over a stranger to the

original controversy by steps in themselves legal becomes a legal wrong. But here the illegality of the means used is without doubt and fundamental. The means used are the libelous and abusive attacks on the plaintiffs' reputation, like attacks on their employees and customers, threats of such attacks on would-be customers, picketing and patrolling of the entrance to their place of business, and the consequent obstruction of free access thereto,—all with the purpose of depriving the plaintiffs of their business. To give operation to a statute whereby serious losses inflicted by such unlawful means are in effect made remediless, is, we think, to disregard fundamental rights of liberty and property, and to deprive the person suffering the loss of due process of law.''

It will be seen from the foregoing excerpts that there is little room for dispute as to the general state of the law on the question before us. The maintenance of a picket in the manner indicated in this record was an unlawful interference with the legal rights of the plaintiff, and partook of the nature both of a private nuisance and of a conspiracy. It was subject to injunction as such. The trade union could act only through its officers. The concerted action of the officers in carrying out these punitive regulations of the union was, in legal effect, a conspiracy to injure the plaintiff in his business, and to deprive him of his lawful rights, and to intimidate and coerce him to submission to the demands of the union.

Some side lights in the evidence awaken interesting observation. The plaintiff is foreign born, and a naturalized citizen. The same is true of some of the defendants and of many of the witnesses. They came from Syria, from Assyria, and from the Balkans. One of such witnesses condemned the plaintiff because he ''ought to wait until some of the Americans start; foreigners ought to wait until afterwards. If they all got to be scabs, they could follow afterwards.'' Another defended the boycott because its defeat ''would take away from our citizenship.'' Another ''figures it is a free country.''

These new citizens fail to see what a sorrowful picture of constitutional liberty they have thrown upon the screen in this case. A humble American citizen who seeks by sheer industry to make a modest living is driven into covert in his own shop,

like a cowering dog into his kennel, while a powerful organization, through its officers, camps upon his shop entrance, and holds a scorpion over his door. Its vigilant thrust is intended to wound every entrant, whether owner or employee or patron. If this is not the beginning of a disturbance of the peace, it is only because the forces arrayed are too unequal for combat. One may be strong enough to spit in the face of an adversary, without fatality or immediate disturbance, but the reaction is still to be reckoned with. From such beginnings, combats, riots, and homicides follow. Such oppression is so intolerable to the American spirit that fatalities are its natural and quite sure sequel. Nor can it be foreseen whether the oppressor or the oppressed shall be first to deliver the fatal blow.

This is not saying that the law looks with disfavor upon trade organizations as such. It does not. But it does frown upon oppression and intimidation, and upon those abuses of power in which frail men sometimes delight, when backed by a strong organization. Trade organization has a wide and legitimate field of activity which it may lawfully exercise in favor of its membership. Within that field, it commands the full protection of the law. But tyranny through the exercise of sheer power is not one of its prerogatives. Nor may its officers exercise such a prerogative under any cover, official or otherwise. If they do so, they are amenable to the law of nuisance and of conspiracy, as other citizens are, and without any exemption therefrom because of their official cloak. It follows that the district court properly entered the injunction decree herein.

II. One of the defenses pleaded by the defendant is that the plaintiff was and is a member of the organization, and was subject to its regulations and to its discipline; and that, there-

2. Injunction: actions: defense in re unlawful boycott.    fore, he is in no position to contest such right of discipline by a suit in equity. If the plaintiff is a member of the defendant union, it is because the defendant prefers to regard him as such, and to insist upon the fact of such membership as a defense hereto. The plaintiff disclaims membership. He returned the card which the defendant had posted in his shop, and did so with notification that he terminated his affiliation with the union, and that he proposed to run an open shop. Even before he had done

that, he was not a member, other than in a merely potential sense. He had no voice or vote in its affairs. He was subject to no dues. He simply had a potential right to be reinstated in the future, if at any time he ceased to be an employing barber and became a journeyman barber. Whether this state of facts left him as a member in any appropriate sense, we will not discuss, because we deem the question quite immaterial, under the record in this case. Granting that he was a member, then he was subject to the regulations and discipline of the organization, and was entitled to its privileges. The organization could discipline him for refusal to obey its regulations, by depriving him of its privileges. In that respect, and in no other, it had full power over him. It could have suspended him, and could have expelled him. This would have exhausted its jurisdiction and power of discipline. It could not follow him outside of the order, and invade his constitutional rights. It never became a sovereign. It never supplanted the sovereignty of the state. The plaintiff remained subject to such sovereignty, and entitled to the protection of all his constitutional guaranties. The decree entered below interferes in no manner with defendant's legitimate right of discipline. If it has not already expelled the plaintiff, it may do so without hindrance by such decree. There is no merit in this defense.

III. The plaintiff took a counter appeal from that part of the decree of the district court which dismissed his petition as against the second group of defendants: that is to say, those defendants who were not officers or members of the union. These defendants were employing barbers. They were affiliated with the defendant union only in the sense that they had voluntarily acquiesced in its regulations and in its scale of prices, and each had agreed to maintain his shop as a union shop and as "closed" against nonunion labor. They had no desire to withdraw their acceptance of the regulations laid down by the defendant union. Naturally, they were anxious to preserve the scale of prices, rather than to adopt a reduced rate. When they heard of the plaintiff's proposal to reduce the prices, they remonstrated with him with such arguments as they could command. They tried in vain to dissuade him. They did tell him that it was bound to

3. INJUNCTION: actions: dismissal of nonparticipating defendants.

make a fight with the union, and that his place of business would be picketed, and, in effect perhaps, that he would find himself in a losing fight. They are opposed to him in the course which he has adopted, and are favorable to the union regulations and the scale of prices. They have had nothing to do with the placing of pickets. They have neither contributed nor promised, directly or indirectly, anything to the support of the picketing. They are not subject to any dues or assessments therefor. They have no part in or control over the course of alleged discipline adopted by the union. As owners of barber shops, they have an interest in the scale of prices and in the regulation of hours. They have a right to be solicitous of their business interests. We think the petition was properly dismissed as to them.

The decree entered below is affirmed on both appeals.— *Affirmed.*

All the justices concur.