RETAIL CLERKS UNION LOCAL 779 OF MIAMI, FLORIDA, as Affiliate of the AMERICAN FEDERATION OF LABOR; LOUIS KATZ, Individually and as President of the State Retail Clerks Union Local 779 of Miami, Florida, v. LERNER SHOPS OF FLORIDA, INC.

193 So. 529
En Banc
Opinion Filed December 5, 1939
Rehearing Denied February 14, 1940

*Gramling & Gramling,* for Appellants;
*Loftin, Calkins & Anderson,* for Appellee.

PER CURIAM.—The plaintiff, who is Appellee here, filed its bill of complaint in the Circuit Court of Dade County

praying that defendant (appellant) be enjoined from picketing its place of business at Miami, Florida. A temporary restraining order was granted, answer was filed, testimony was taken, and on final hearing, the temporary restraining order was made permanent. This appeal is from the final decree.

The record discloses that appellant is a branch of the American Federation of Labor, that appellee is a ladies' ready-to-wear establishment and that appellant over a period of months, made several unsuccessful attempts to negotiate with appellee a plan whereby its place of business might be unionized, but failing to reach such an agreement, appellant placed pickets in front of appellee's establishment bearing placards on which were painted in large letters after the word "Picket" the words, "This Store Unfair to Organized Labor, Retail Clerks Union Local 779, Aff. A. F. of L."

The record also discloses that none of the employees of appellee are members of appellant Union, that there is no dispute between appellee Union, and its employees as to hours of work, wages, or working conditions, that appellee has no objection whatever to its employees becoming members of the Union, that no strike is pending among appellee's employees and that the sole purpose of appellant is to secure an agreement with appellee whereby its employees will be brought into the Union.

There is a decided cleavage between appellant and appellee as to what question is brought here for disposition. Appellant contends that the picketing was to effect a closed shop agreement, better wages, hours, and working conditions, while appellee contends that its sole purpose was to compel appellee's employees to join appellant. An examination of the pleadings and the evidence points to the correctness of appellee's contention.

This Court is committed to the doctrine that a labor organization may exercise the right of peaceful picketing. Paramount Enterprises, Inc., v. Mitchell, 104 Fla. 407, 140 So. 328, wherein we held:

" * * * that employees have a right to combine and fix the amount of their daily wage and to whom they will sell it. It is also true that when not under contract they may quit the services of another at any time they desire. It is alike true that employers have the right to determine the daily wage they are willing to pay and who they will employ. Members of a labor organization may persuade their confederates not to work except on "payment of an established wage they may, without coercion, bring their cause to the court of public opinion in a peaceful manner but neither employer nor employee is permitted to use threats, force, violence, coercion, or intimidation in doing this, nor will employer or employee be permitted to present, urge, or advertise his cause by false statements, libelous attack, insulting language, derogatory implications, or by other means calculated to become a nuisance, obstruct traffic or in any way to impede or hinder the orderly course of business or other relations. Note 27 A L. R. 651. Under any other rule every legitimate business would be subject to the whim of any one having opposing views as to the method of its operation."

The evidence discloses that the sales from appellee's business dropped from about $2,500 per day to $1,592 per day when the picketing by appellant began and that the day after the pickets were removed by the restraining order, the business jumped up to $4,380; that said business had been much better since the pickets were removed, that the drop in receipts was due entirely to picketing and that there were

no other contributing causes to the fluctuation in said business.

The law is settled in this country that a labor organization may picket one's place of business for certain specified purposes but here there is no showing whatever that such purposes are in being. It is not shown that appellee has been unfair to appellant, there was no strike, no complaint about working conditions, or hours of work, in fact there was no controversy whatever between appellee and its employees.

The right to join a lodge, a religious, civic, labor, or other group, is a voluntary and personal one to the joiner. In this case, there is no conclusive showing that appellee's employees desire to unite with appellant nor is it shown that if they had expressed such a desire any obstacle has been interposed to their doing so. Under such circumstances, picketing will be enjoyed if it is shown to adversely affect one's business.

Peaceful picketing will not be permitted for the purpose of dictating the policy of an owner's business, to determine whom he will employ or to intimidate him in the management of his business.

As we said in Paramount Enterprises, Inc., v. Mitchell, *et al., supra,* personal liberty and private property are fundamental rights in this country. The very purpose of the law is to protect these rights. Any unlawful interference with them by false statement, acts of coercion, intimidation, malice or covert implications that threaten mischief or injury to them may be enjoined. Weissman, *et al.,* v. Juriet, 132 Fla. 661, 181 So. 898; Safeway Stores, Inc., v. Retail Clerks Union Local No. 148, 184 Wash. 422, 51 Pac. (2nd) 372; Traub Amusement Co., Inc., v. Macker, *et al.,* 215 N. Y. Supp. 397, 127 Misc. 335; Blakely Laundry

Co. v. Cleaners & Dyers Union, Local No. 18422, *et al.,* 11 N. J. Misc. 915, 169 Atl. 541. There is a wealth of authority on this question but we have cited only a few leading cases.

The evidence supporting the material facts relied on for the restraining order is uncontradicted. The final decree appealed from is somewhat broad in its terms but we cannot say that it was harmful, or justifies a reversal on this record.

Affirmed.

TERRELL, C. J., WHITFIELD, BROWN and THOMAS, J. J., concur.

BUFORD and CHAPMAN, J. J., dissent.

CHAPMAN, J. (dissenting).—The record here shows that Lerner Shops of Florida, Inc., for a period of approximately four years prior to its filing suit in the lower court, operated a store at 30 East Flagler Street in the City of Miami, Florida, where ladies' ready-to-wear was sold, and gave employment to twenty-four sales ladies; the business was managed by a Mr. Barney Fleisher, sales manager, and the superior executive was Mr. Leon Gottleib, of New York City. The twenty-four clerks employed in this business were non-union labor.

During the months of April or May, 1938, eight of the clerks employed in Lerner's store applied for membership in the Retail Clerks Union Local 779, Miami, Florida. The representatives of the Union contacted Mr. Fleisher, sales Manager of Lerner's Store, for the purpose of negotiating terms for unionizing the labor in Lerner's store, when the manager advised that he was without authority to act on this question and expressed no preference between union and non-union labor, but referred them to Mr. Gottlieb, of New York City. It was shown that several stores in the

down-town area of the City of Miami had signed contracts to employ only union labor.

The chairman and a member of the grievance committee of the Central Labor Union contacted the sales manager of Lerner's, and were by him advised that he was without authority to negotiate about the unionizing of the labor in the store, but advised that this authority was with Mr. Gottlieb of New York City, and that he, personally, was indifferent about the employees of the store joining the union. The sales manager agreed to advise Mr. Hoyt, chairman of the grievance committee, when Mr. Gottlieb next came to Miami, when the same could be discussed, and this he did and Mr. Gottlieb tried to contact Mr. Hoyt, but was unsuccessful because Mr. Hoyt at the time was temporarily out of the city of Miami, and Mr. Gottlieb was in the City of Miami on this visit less than two days.

On October 13, 1938, attorney Wolf, of New York, replied to a letter sent him by Mr. Marshall, secretary of the Retail Clerks Union of Miami, and advised Mr. Marshall that he had contacted Mr. Gottlieb and was advised that he was going to the City of Miami on a business trip, but Mr. Gottlieb did not advise the Central Labor Union of the approximate date he expected to be at his store in the City of Miami.

Pursuant to a vote by the Central Labor Union, it was ordered that Lerner's store be placed on the list of businesses that were unfair to labor. On December 2, 1938, two young women appeared on the sidewalk in front of Lerner's store bearing placards on which were painted in large letters, viz.: "PICKET" "THIS STORE UNFAIR TO ORGANIZED LABOR and the RETAIL CLERKS UNION LOCAL 779 AFF. A. F. OF L." The sales of the shop on this day dropped to around $1,592.60, when its daily average sales were around

$2,500.00. The employees of Lerner's store had never been on a strike, and the average salary was from $17.00 to $20.00 per week, and an increase had been allowed them. The young ladies engaged in picketing had never worked for Lerner's store. The Retail Clerks Union and the Central Labor Union had not been able to negotiate with Mr. Gottlieb from May until December, 1938.

It was contended by the Retail Clerks Union that an employee of Lerner's store had been dismissed in March or April, 1938, because of her activities in unionizing Lerner's store, but the sales manager denied the charge and stated that he had the authority to hire and dismiss employees and that the employee was not dismissed because of her union labor activities, but because of a $3.00 error on the price of an article of merchandise, although she had worked for the Lerner store some years prior to her dismissal. She did not appear as a witness and her dismissal and cause therefor are too remote in point of time to become material to the issues here presented.

There is no evidence in the record that the two pickets intimidated or frightened the buying public, made or uttered threats against the plaintiff or its employees, or the public, or coerced any person, or persons, in their ingress or egress to Lerner's store, or in any manner interfered with the purchase and sale of the merchandise of the store. There was no breach of the peace committed by the pickets, nor was their conduct while picketing such as to cause others then in the store to commit a breach of the peace, but, on the other hand, walked the sidewalk in front of Lerner's store as pickets bearing placards with the inscription, *supra*.

The unsolved problem existing between Lerner's store and the Retail Clerks Union was the right to negotiate for

the purpose of obtaining a contract to unionize the employees of the store, and their efforts began in May, 1938, and resulted in placing pickets at the store on December 2, 1938. It was an adjudgment of this dispute that the Retail Clerks Union desired to negotiate with Lerner's store but had been unsuccessful. It is not necessary for a decision of this cause for the Court to consider the merits or demerits of this dispute, but only the existence thereof is sufficient. The hours of employment, the amount of wages received therefor and the conditions under which the employees labored are not material to the issues involved.

On December 2, 1938, the Lerner Shops of Florida, Inc., filed a bill of complaint in the Circuit Court of Dade County, Florida, against the defendants below, appellants here, and the prayer thereof is, viz.:

"THE PREMISES CONSIDERED, the plaintiff prays that, pending final hearing of this cause, the defendants, and each of them, their officers, agents, employees and successors in office, and all persons combining and conspiring with them, and all other persons whomsoever, absolutely to desist and refrain from in any way or manner displaying signs, placards, or other writings, or by oral words or by signs, near the entrance to the plaintiff's shop at number 30 East Flagler Street, in the City of Miami, Florida, and on the sidewalk in front of the plaintiff's said shop, or at any other place in the vicinity of plaintiff's said shop that would advertise, suggest or intimate that the plaintiff is in anywise unfair to organized labor, or to members of RETAIL CLERKS UNION LOCAL 779, of MIAMI, FLORIDA, or to that Union; and from interfering with the business of the plaintiff, by intimidation, coercion, or threats against the plaintiff, its officers, agents or employees, or its place of business, or its customers or prospective customers, and from interfering

with the free movement of the plaintiff's employees in their ingress and egress to and from the plaintiff's said shop, and from their respective homes to the plaintiff's said shop and return, or with the ingress or egress of customers or prospective customers to the plaintiff's said shop; and that, upon final hearing, said temporary restraining order shall be made perpetual."

An application was made in the court below for a restraining order, *without notice to the defendants,* and the same issued and was served. A motion to dissolve the restraining order was filed by the defendants, and likewise an answer, in which the bill of complaint was fully admitted or denied, and evidence was taken before the trial court and after the completion of the taking of testimony by the respective parties, a final decree was entered perpetually enjoining the defendants from picketing the place of business of the plaintiff below. From the final decree an appeal has been perfected to this Court and the same assigned as error here.

The question presented for a decision is whether or not picketing by organized labor, unaccompanied by any illegal acts or a breach of the peace, for the purpose of obtaining negotiations for an agreement for the employment of only union labor and a closed shop, is the proper subject for injunctive relief.

There is no statute in Florida defining or controlling what is commonly recognized as picketing or labor disputes. Picketing has been defined as a body of men belonging to a trade union sent to watch and annoy men working in a shop not belonging to the union or against which a strike is in progress. Vol. 32 Corpus Juris, p. 179, par. 261, thusly defines picketing:

" 'Picketing, it has been said, is a term borrowed from

the nomenclature of warfare; and its commonly accepted meaning as used in relation to industrial disputes is the stationing of men at or near the plant or shop of the party with whom workmen have a dispute, to induce other workmen to withdraw from or not to enter his employ or to induce his customers or the general public to abstain from business relations with him."

The authorities of the country are in irreconcilable conflict on whether or not picketing is lawful or unlawful. Many decisions based upon statute or otherwise hold that all picketing is unlawful and will be enjoined. The general trend of holdings of the courts is that picketing, if not conducted in such numbers as will of itself amount to intimidation, and when confined to useful or peaceful argument and entreaties, which acts and doings are not unlawful or amount to a breach of the peace, then it may be said that picketing is lawful.

The term "labor dispute" has not been settled by statute in Florida. Other States have enacted statutes defining "labor disputes" and the same have been construed by courts of many of the other States. It is not necessary for a disposition of the case at bar to define what is commonly considered as a "labor dispute" but the same can be determined upon each set of facts when presented until the Legislature of Florida desires to legislate thereon, but the Wisconsin Labor Code defines "labor dispute" thusly:

"The term 'labor dispute' includes any controversy concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, or concerning employment relations, or any other controversy arising out of the respective interests of employer and employee, regardless of whether or not the disputants stand in the proxi-

mate relation of employer and employee.'" See Lauf v. E. G. Shinner & Co., 303 U. S. 323, 58 Sup. Ct. 578, 82 L. Ed. 872.

This Court had a similar question before it in the case of Paramount Enterprises, Inc., v. Mitchell, 104 Fla. 407, 140 So. 328, when the following language was used:

"The law recognizes the right of the trades, crafts, guilds and arts, whether composed of skilled or unskilled workmen, to organize and invite others to join them. When organized, they may use the organization to promote their social, civic, and economic betterment, among other things, that of securing as much as they can for their labor. Employers may also organize for similar purposes and for the purpose of securing the best possible return on their capital. Every other profession and business may organize for like purpose but when organized, the law recognizes no distinctions among them but all must conform alike to its decrees and mandates. Every organization, including its individual members is bound and protected by social and constitutional guaranties that all must respect, among which is the right to peacefully own property and enjoy the pursuit of a trade, business, or profession. The law will not permit such rights to become a prey to those who would without just cause invade them.

"It is well settled that employees have a right to combine and fix the amount of their daily wage and to whom they will sell it. It is also true that when not under contract they may quit the services of another at any time they desire. It is alike true that employers have the right to determine the daily wage they are willing to pay and who they will employ. Members of a labor organization may persuade their confederates not to work except on payment of an established wage; they may, without coercion bring

their cause to the court of public opinion in a peaceful manner; but neither employer nor employee is permitted to use threats, force, violence, coercion, or intimidation in doing this, nor will employer or employee be permitted to present, urge, or advertise his cause by false statements, libelous attack, insulting language, derogatory implications, or by other means calculated to become a nuisance, obstruct traffic, or in any way to impede or hinder the orderly course of business or other relations." See Weissman v. Jurett, 132 Fla. 661, 181 So. 898; State *ex rel.* Meredith v. Borman, 138 Fla. 149, 189 So. 669.

Counsel for appellee contend that picketing is unlawful and should be enjoined when there is no strike by employees, and whether or not intimidation or coercion of customers exist. The cause of Traux v. Corrigan, 257 U. S. 312, 42 Sup. Ct. 124, 66 L. Ed. 254, is cited by counsel for appellee. An examination of this case shows that a dispute arose between the plaintiffs and the defendants' union. The plaintiffs operated a restaurant in Bisbee, Arizona, and the dispute arose over the terms and conditions of the employment, and a strike was called by the union. The following facts were established by the plaintiffs against the union, viz.:

"The complainant and its exhibits make this case: The defendants conspired to injure and destroy plaintiffs' business by inducing their theretofore willing patrons and would-be patrons not to patronize them and they influenced these to withdraw or withhold their patronage:

"(1) By having the agents of the union walk forward and back constantly during all the business hours in front of plaintiff's restaurant and within five feet thereof, displaying a banner announcing in large letters that the restaurant was unfair to cooks and waiters and their union.

"(2) By having agents attend at or near the entrance of the restaurant during all business hours and continuously announce in a loud voice, audible for a great distance, that the restaurant was unfair to the labor union.

"(3) By characterizing the employees of the plaintiffs as scab Mexican labor, using opprobrious epithets concerning them in handbills continuously distributed in front of the restaurant to would-be customers.

"(4) By applying in such handbills abusive epithets to Truax, the senior member of plaintiffs' firm, and making libelous charges against him, to the effect that he was tyrannical with his help, and chased them down the street with a butcher knife, that he broke his contract and repudiated his pledged word; that he had made attempts to force cooks and waiters to return to work by attacks on men and women; that a friend of Truax assaulted a woman and pleaded guilty; that plaintiff was known by his friends, and that Truax's treatment of his employees was explained by his friend's assault; that he was a 'bad actor.' ·

"(5) By seeking to disparage plaintiff's restaurant, charging that the prices were higher and the food worse than in any other restaurant, and that assaults and slugging were a regular part of the bill of fare, with police indifferent.

"(6) By attacking the character of those who did patronize, saying that their mental calibre and moral fibre fell far below the American average, and inquiring of the would-be patrons: Can you patronize such a place and look the world in the face?

"(7) By threats of similar injury to the would-be patrons: by such expressions as 'All ye who enter here leave all hope behind.' 'Don't be a traitor to humanity;' by offering a reward for any of the ex-members of the union caught eating in the restaurant; by saying in the handbills: 'We

are also aware that handbills and banners in front of a business house on the main street give the town a bad name, but they are permanent institutions until William Truax agrees to the eight-hour day.'

"(8) By warning any person wishing to purchase the business from the Truax firm that a donation would be necessary, amount to be fixed by the District Trades Assembly, before the picketing and boycotting would be given up."

On the above established facts the Court said: "Plaintiffs' business is a property right (*Duplex Printing Press Co. v. Deering,* 254 U. S. 443, 465) and free access for employees, owner and customers to his place of business is incident to such right. Intentional injury caused to either right or both by a conspiracy is a tort. Concert of action is a conspiracy if its object is unlawful or if the means used are unlawful. *Pettibone v. United States,* 148 U. S. 197, 203; *Duplex Printing Press Co. v. Deering, supra.* Intention to inflict the loss and the actual loss caused are clear. The real question here is, were the means used illegal? The above recital of what the defendants did, can leave no doubt of that. The libelous attacks upon the plaintiffs, their business, their employees, and their customers, and the abusive epithets applied to them were palpable wrongs. They were uttered in aid of the plan to induce plaintiffs' customers and would-be customers to refrain from patronizing the plaintiffs. The patrolling of defendants immediately in front of the restaurant on the main street and within five feet of plaintiffs' premises continuously during business hours, with the banners announcing plaintiffs' unfairness; the attendance by the picketers at the entrance to the restaurant and their insistent and loud appeals all day long, the constant circulations by them of the libels and epithets

applied to employees, plaintiffs and customers, and the threats of injurious consequences to future customers, all linked together in a campaign, were an unlawful annoyance and a hurtful nuisance in respect of the free access to the plaintiffs' place of business. It was not lawful persuasion or inducing. It was not a mere appeal to the sympathetic aid of would-be customers by a simple statement of the fact of the strike and a request to withhold patronage. It was compelling every customer or would-be customer to run the gauntlet of most uncomfortable publicity, aggressive and annoying importunity, libelous attacks and fear of injurious consequences, illegally inflicted, to his reputation and standing in the community. No wonder that a business of $50,000 was reduced to only one-fourth of its former extent. Violence could not have been more effective. It was moral coercion by illegal annoyance and obstruction and it thus was plainly a conspiracy."

That Court drew the distinction between a peaceable or lawful boycotting or picketing, like the case at bar, and a picketing where threats, coercion, or intimidation and loss to a business was superinduced by unlawful acts, and in so doing used the following language:

"It is to be observed that this is not the mere case of a peaceful secondary boycott as to the illegality of which courts have differed and States have adopted different statutory provisions. A secondary boycott of this kind is where many combine to injure one in his business by coercing third persons against their will to cease patronizing him by threats of similar injury. In such a case the many have a legal right to withdraw their trade from the one, they have the legal right to withdraw their trade from third persons, and they have the right to advise third persons of their intention to do so when each act is considered singly. The

question in such cases is whether the moral coercion exercised over a stranger to the original controversy by steps in themselves legal becomes a legal wrong. But here the illegality of the means used is without doubt and fundamental. The means used are the libelous and abusive attacks on the plaintiffs' reputation, like attacks on their employees and customers, threats of such attacks on would-be customers, picketing and patrolling of the entrance to their place of business, and the consequent. obstruction of free access thereto—all with the purpose of depriving the plaintiffs of their business. To give operation to a statute whereby serious losses inflicted by such unlawful means are in effect made remediless, is, we think to disregard fundamental rights of liberty and property and to deprive the person suffering the loss of due process of law."

We have carefully examined the following authorities cited by counsel for appellees, viz.: Crouch v. Central Labor Council, 134 Ore. 612, 293 Pac. 729; Safeway Stores, Inc. v. Retail Clerks' Union Local No. 148, 184 Wash. 322, 51 Pac. (2d) 372; L. Daitch & Co. v. Retail Grocery & Dairy Clerks' Union of Greater New York, 221 N. Y. Supp. 446, 129 Misc. 343; Kraemer Hosiery Co. v. American Federation of Full Fashioned Hosiery Workers, 305 Pa. 206, 157 Atl. 588; Wasilewski v. Bakers' Union, 118 N. J. Eq. 349, 179 Atl. 284; Gevas v. Greek Restaurant Workers' Club, 99 N. J. Eq. 770, 143 Atl. 309; Moreland Theatres Corp. v. Portland Moving Picture Mach. Operators' Protective Union, 140 Ore. 35, 12 Pac. (2d) 333; Ellis v. Journeyman Barbers' International Union of America, 194 Ia. 1179, 191 N. W. 111; Traub. Amusement Co., Inc. v. Macker, 127 Misc. 335, 215 N. Y. Supp. 397.

It becomes a Herculean task to harmonize or reconcile the conflicting rules adopted by the courts of last resort

controlling the right of a labor union to resort to picketing for the purpose of enforcing some demand of the union. Some courts hold that picketing *per se* is unlawful, and others hold that picketing without force, coercion, intimidation or a breach of the peace is within the law. Florida has adopted the latter rule. The burden of proof under the law was on the plaintiffs to show that the pickets here complained of, and their conduct, were such while on the sidewalks in front of Lerner's store as amounted to a breach of the peace. We have not overlooked the testimony as to the two men located on the opposite side of the street at the time of the picketing, but their presence there at the time of the picketing is all that is shown.

We are unable to find in this record testimony showing intimidation, coercion, or threats on the part of these pickets. This burden was on the plaintiffs to bring it within the rule so as to obtain the issuance of a restraining order. Careful consideration has been given to the splendid briefs filed by counsel for the respective parties and the able arguments at the bar of this Court, but the record here fails to contain evidence to support the decree assigned as error in this cause.

The decree appealed from should be reversed.