Louis E. MINOR, Jr. and Herbert S. Woods, co-partners, doing business as Oil Field Service Co., and Warren Diederich and Gene Bye, co-partners, doing business as Diederich and Bye, Plaintiffs and Respondents,

v.

BUILDING AND CONSTRUCTION TRADES COUNCIL in affiliation with Building and Construction Trades Department, American Federation of Labor, and Harold M. Olson, individually and as President of Minor Building and Construction Trades Council, affiliated with the Building and Construction Trades Department, American Federation of Labor; Carpenters Local No. 1032; Laborers Local No. 554; Electricians Local No. 714; Drivers Local No. 74; Bricklayers Local No. 2, Plumbers and Steamfitters Local No. 627; Painters & Decorators Local No. 565; Plasterers & Cement Finishers Local No. 837; Lathers Local No. 519; Operating Engineers Local No. 49; Ironworkers Local No. 708; and the officers, representatives, and business agents of said Unions in their individual and representative capacities, and as representatives of the class to which they all belong, Defendants and Appellants.

No. 7481.

Supreme Court of North Dakota.

Feb. 6, 1956.

Joseph P. Stevens, Minot, Wm. D. Gunn, and Donald C. Savelkoul, St. Paul, Minn., for appellants.

Bjella & Jestrab, Williston & William A. Brown, Austin, Tex., for respondents.

GRIMSON, Judge.

The plaintiffs, Louis E. Minor, Jr. and Herbert S. Woods, co-partners, doing business as Oil Field Service Co., and Warren Diederich and Gene Bye, co-partners, doing business as Diederich & Bye, were contractors engaged in the construction business. They had jointly entered into a contract with the Signal Oil & Gas Company for doing the stone and concrete work on the $9,000,000 gas extraction plant which the Signal Oil & Gas Company was building near Tioga, North Dakota. The defendants are labor unions and their officers and representatives.

The plaintiffs, alleging that the defendants on plaintiff's refusal to force their employees to unionize their plant, commenced to illegally picket and banner the plant, causing the plaintiff irreparable damage, brought this action and asked for an injunction "restraining the defendants from in any way interfering with, molesting, or damaging the business of the plaintiffs by picketing or otherwise." A temporary restraining order was issued. The defendants then answered making a general denial, alleging that plaintiffs discriminated against the unions; that a labor dispute existed

and that this controversy is covered by the provisions of the Labor Management Relations Act, 1947, 29 U.S.C.A. § 141 et seq., so that the state court was without jurisdiction in this matter. After the hearing on the merits the district court issued its order for judgment granting a limited injunction. Defendants appeal from such judgment demanding a trial de novo.

Originally, J. F. Pritchard & Co., a nationwide construction company of Kansas City, had the contract for the entire construction project but this was later modified so that they were responsible only for the design of the plant and the supervision necessary to protect their guaranty in regard to the design. That company had a closed shop contract with labor unions and under that contract was bound to operate on the terms of the local unions who had jurisdiction over the job. Their representative at Tioga notified the local unions of the Pritchard contract. Soon thereafter, on July 13, 1953, a representative of the National Carpenters' Union requested a meeting with Mr. Diederich and the employees. Mr. Diederich was not present at the time but later that day called a meeting of the employees. He informed them that they could "go union or not as they wished." He explained to them the changes that would come under a union contract and asked them for a vote. Of some 35 to 40 employees, 20 to 35 voted in favor of remaining non-unionized. Some union representatives talked with the men and claimed they found some of them willing to join a union. One meeting between the two representatives of the union and Mr. Diederich and Mr. Minor of the Oil Field Service Co., occurred on July 16, 1953. At that time there was some discussion about the furnishing of iron workers by the union. Plaintiffs then suggested that the union get in touch with Mr. Miller of the Signal Oil & Gas Company and Mr. Ohley of the Pritchard Company. Several of the representatives of the defendants talked at different times with the officers of the Signal Oil & Gas Company, and the J. F. Pritchard Company, urging them to force plaintiff to enter into a union contract.

Finally a meeting between the contractors of the Tioga Gas Plant and representatives of the Building & Construction Trades Council was arranged for August 19, 1953, by the Minot Building and Construction Trade's Council. Mr. Miller of the Signal Oil & Gas Company, and a representative of J. F. Pritchard & Company, met with thirteen union representatives at that meeting. While the plaintiffs were invited to that meeting they did not receive their notice in time to attend. Mr. Miller, in charge of the construction of the Tioga Gasoline Plant for the Signal Oil & Gas Company, testified that Mr. Olson, President of the Minot Building and Construction Trade's Council had stated that the "purpose of the meeting was to negotiate a contract with Oil Field Service Company, and Diederich & Bye to employ union help in the performance of their job." He testified further:

"Q. Did they ask you to intercede? A. Yes. * * * They asked me to make a union job of it."

On cross examination by defendants' counsel he testified as follows:

"Q. On this occasion or at any other time, Mr. Miller, did these men, representing this union, ask you to cancel your contract with Diederich & Bye and Oil Field Service? A. Yes.

"Q. On what occasion was that? A. I believe it was the occasion when Mr. Taylor attended the meeting here. When forceful expression to the effect we should go all out on 100 per cent union labor job on that plant, when I refused to take action inside the organization of those contractors. * * *

"Q. Did any representative of any union at any time tell you that the only type of contract that they were willing to negotiate with the plaintiff and Diederich & Bye was a contract containing a clause which required all of the em-

ployees on the job to be members of the union? A. Yes, sir, with one exception: I asked that question, the exception being that if they could not supply within a reasonable time, so many days, so many hours, the quantity of journeymen ordered, then men that did not belong to the union could be secured by others and would be permitted to work for a certain period of time. * * *

"Q. All right, sir, did the union at any time, any representative of the union, at any time tell you that they might be willing to give up a requirement that the contractors employ exclusively union members? A. In some of our discussions the union members stated that if they were unable to deliver the required or requisitioned number of different artisans within a specified time, 48 hours was mentioned, that the contractors then could seek that type of artisans elsewhere and they would be given permission to be so employed for a specified period, I think possibly 30 days."

Samples of contracts which would be asked if the shops were unionized were presented to Mr. Miller, the representative of the Signal Oil & Gas Company. With few exceptions the contracts provided for some kind of union security clause. Two of the contracts included the provision that "only members of the union or men eligible for membership may be employed." Another contract provided that "any person newly employed shall be so employed only on a thirty (30) day trial basis at which time he shall either be dismissed without recourse or placed on a regular seniority list in which event employee shall apply for union membership." Another contract provided: "All employees covered by this agreement shall be given a 30-day trial period in which to qualify for any classification of work covered by this agreement, after which trial period they shall, as a condition of employment become members of the union in good standing." The contract of Pritchard & Company, with In-

ternational Union of Operating Engineers provided:

"Each person (hereinafter referred to as employee) who is now or hereafter employed by the employer in unit for which the union or any local thereof is the agent, shall, as a condition of employment, become or remain a member of the union on or before the 30th. day following the commencement of such employment or following the effective date of this agreement whichever is the later. Such employees shall retain membership in the union for the duration of this agreement, as a condition of employment. Failure of any employee to comply with the provisions of this article shall upon request of the union, result in the termination of such employee. * * *

Pritchard & Company were the original contractors on this project and still had supervision thereof. Their representative, Mr. Ohley, was prominent in the discussions preceding the picketing.

The Signal Oil & Gas Company refused to interfere. It also appears that at the meeting the Minot Labor Council had already authorized their representative to banner the job if they did not arrive at a satisfactory contract with Oil Field Service Company and with Diederich & Bye that day. The Williston Labor Council was to be asked that night to do likewise which it did. Upon that warning Mr. Miller said he would consider the contracts and if he reconsidered he would telephone their secretary. He did not do that. The second day following that meeting, on August 21st. picketing commenced at the two entrances to the plant and the place where the railroad entered the grounds. The pickets carried a banner reading: "This project unfair to organized labor. Bannered by Minot and Williston B. & C. T. C." The picketing continued until the service of the temporary restraining order on August 28, 1953.

During this period the plaintiffs employed a minimum of 35 employees and a maxi-

mum of 90 employees. Only a few of the employees were members of any craft union. Some had indicated a willingness to join. None of them had asked for intervention on their behalf. Very little contact had been made by the representatives of any of the defendants with any of the plaintiff's employees to get them to join by peaceful persuasion.

None of those engaged in picketing were employees of the plaintiffs at the time and only one had been before. None of the employees of the plaintiffs ceased work on account of the picketing.

It was stipulated by the parties that the work performed by the plaintiffs in the construction of the natural gas plant affected interstate commerce within the meaning of the constitution of the United States and the Labor Management Relations Act of 1947.

At the opening of the trial the plaintiffs moved to drop Diederich & Bye as a party plaintiff on the grounds that they were no longer employed at the Tioga Gasoline Plant. The contract under which they were originally employed had been terminated. Objection was made that to drop Diederich & Bye would change the issue; that defendants would be handicapped in presenting their evidence; that the temporary injunction had been in force two months upon the petition and evidence of Diederich & Bye as well as the Oil Field Service Company; that if this injunction was found erroneous a demand for damages was pending. The court ruled that Diederich & Bye would be dropped as a party subject to terms to be determined later and that they were not released from the results of any determination made as to damages and cost in connection with the temporary injunction.

■ Section 28–0211, NDRC 1943, provides that "parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just." Diederich & Bye had ceased their work on the project. They were not

then asking for an injunction and as to them any future injunction would have been in vain. The court protected the rights of the defendants against them as to the temporary injunction. Clearly the court acted as the ends of justice seemed to require. 39 Am.Jur., Parties, Section 97, p. 965.

The reference to plaintiffs hereafter will include the Oil Field Service only.

■ The first question that arises is whether or not a labor dispute as defined by the state and federal law is involved in the case at bar. Sec. 34–0801(1), NDRC 1943 reads as follows:

" 'Labor dispute' shall include any controversy concerning terms or conditions of employment or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment whether or not the disputants stand in the proximate relationship of employer and employee".

This is practically the same language as used in the Taft-Hartley Act, 61 U.S. Statutes, Sec. 2(9), p. 138, U.S.C.A. Title 29, § 152(9).

The evidence shows that the plaintiffs were not paying union scale wages nor maintaining union conditions of employment. Only a few of the plaintiff's employees at the time involved were members of unions and only a minority of the plaintiff's employees expressed a desire to join a union. The vote of the employees taken by Diederich indicated that, considering the difference in wages and conditions of employment that would be required under the union regulations and those which the plaintiffs were giving, the majority preferred to continue under the wages and conditions given by the plaintiffs. Terms and conditions of employment entered into that discussion and probably determined the result.

■ This may have had some bearing, not only on the action of the plaintiffs in

refusing to enter into any contract with the unions, but also on the unions in ordering the picketing, for the purpose of unionizing the project. Naturally the union wanted to organize all labor wherever possible. The unionization of a plant has been held a legal labor objective according to the overwhelming weight of authority. Peters v. Central Labor Council, 179 Or. 1, 169 P.2d 870, 872; Lauf v. E. G. Shinner & Co., 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872. Under the Sec. 34–0801, supra, a labor dispute may exist even if the disputants do not stand in the relationship of employer and employee as is the situation here.

■ We are constrained, therefore, to hold that a labor dispute existed in the case at bar.

■ The appellants claim that the findings of the trial court are not supported by the evidence. When a trial de novo is demanded this court considers all the evidence and makes its conclusions therefrom. In Cretors v. Troyer, 63 N.D. 231, 237, 247 N.W. 558, 560, this court says:

"The case is here for trial de novo under section 7846, as amended. * * * We must view the record presented and find the facts from that record. The findings of the trial court are not clothed with the same presumption in their favor as in other cases, but nevertheless we must give them appreciable weight. See Christianson v. Farmers' Warehouse Ass'n, 5 N.D. 438, 67 N.W. 300, 32 L.R.A. 730; Doyle v. Doyle, 52 N.D. 380, 202 N.W. 860; Lakota Mercantile Co. v. Balsley, 60 N.D. 768, 236 N.W. 631." See also Andersen v. Resler, 57 N.D. 655, 223 N.W. 707; Gunsch v. Gunsch, N.D., 67 N.W. 2d 311.

In our determination of this case we have considered the court's findings and all the evidence and base our conclusions thereon.

We now come to the real issue in the case at bar. Does the state court have jurisdiction over this controversy?

As industry developed difficulties arose between labor and industry. In an endeavor to amicably adjust such difficulties the United States Congress early enacted legislation. There was the Clayton Act, 1914, 15 U.S.C.A. § 12 et seq., the Norris-LaGuardia Act in 1932, 29 U.S.C.A. § 101 et seq., the Wagner Act of 1935, 29 U.S.C.A. § 151 et seq., and finally, the Labor Management Relations Act, 1947, 29 U.S.C.A. § 141 et seq., commonly and hereinafter referred to as the Taft-Hartley Act. The reason and purpose of this legislation is well stated by Justice Frankfurter in Carpenters and Joiners Union of America, Local No. 213 v. Ritter's Cafe, 315 U.S. 722, 62 S.Ct. 807, 808, 86 L.Ed. 1143 as follows:

"The economic contest between employer and employee has never concerned merely the immediate disputants. The clash of such conflicting interests inevitably implicates the well-being of the community. Society has therefore been compelled to throw its weight into the contest. The law has undertaken to balance the effort of the employer to carry on his business free from the interference of others against the effort of labor to further its economic self-interest. And every intervention of government in this struggle has in some respect abridged the freedom of action of one or the other or both."

It having been stipulated that the work performed by the plaintiffs in the construction of the natural gas plant affected interstate commerce within the meaning of the constitution of the United States and the Labor Management Relations Act of 1947, defendants argue that jurisdiction over the labor dispute here involved is preempted by that act and that the state court has no jurisdiction.

■ The Labor Management Relations Act applies to all "industrial strife which interferes with the normal flow of commerce." It prescribes the legitimate rights of both employees and employers in their relations affecting commerce, and provides orderly and peaceful procedures for pre-

venting interference by either with the legitimate rights of the other.

North Dakota was one of the states that passed a labor management relations act along the lines of the Federal Act. It is conceded that the North Dakota act as far as interstate commerce is concerned covers only such areas as are not covered by the Federal Act. Northern Imp. Co. v. St. Peter, N.D., 74 N.W.2d 100. However, in the case of Garner v. Teamsters, Chauffeurs & Helpers Union, 346 U.S. 485, 74 S.Ct. 161, 164, 98 L.Ed. 228, the United States Supreme Court said:

"The national Labor Management Relations Act, as we have before pointed out, leaves much to the states, though Congress has refrained from telling us how much. We must spell out from conflicting indications of congressional will the area in which state action is still permissible."

■ One area left open to the states by the Taft-Hartley Act is the enforcement of such measures as deemed necessary for the protection of the citizens of the state.

■ The state is not excluded from exercising its police power if the unfair labor practice is attended by illegal conduct coercive in nature. See Milk Wagon Drivers Union, etc. v. Meadowmoor Dairies, 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836; Retail Clerks' Union, etc. v. Wisconsin Employment Relations Board, 242 Wis. 21, 6 N.W. 2d 698, 149 A.L.R. 452; Ellis v. Journeymen Barbers' International Union, 194 Iowa 1179, 191 N.W. 111, 32 A.L.R. 756; Building Service Employees International Union, Local 262 v. Gazzam, 339 U.S. 532, 70 S.Ct. 784, 94 L.Ed. 1045; Garner v. Teamsters, Chauffeurs and Helpers, etc., 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228; Allen-Bradley Local, etc. v. Wisconsin Employment Relations Board, 315 U.S. 740, 62 S.Ct. 820, 86 L.Ed. 1154.

"The power and duty of the State to take adequate steps to preserve the peace and protect the privacy, the lives, and the property of its residents can-

not be doubted." Carlson v. People of State of California, 310 U.S. 106, 113, 60 S.Ct. 746, 749, 84 L.Ed. 1104.

The district court in the case at bar, after listening to the testimony and considering the evidence, made findings of fact regarding the behavior of the defendants in the course of their picketing and came to the following conclusion:

"That the picketing, bannering and boycotting carried on by the defendants and their representatives, in the use of cameras and the taking of notes with pencil and paper ostensibly to record the identity of persons and vehicles engaging in business intercourse with Plaintiff, Oil Field Service Company, in effecting ingress and egress to and from the plant site of Signal Oil & Gas Company and the maintenance of a rotating picket line back and forth, across and directly in front of the plant entrances so as to create a psychological, if not an actual, obstruction to the free flow of traffic to and from the plant site, and other coercive and intimidating conduct which, if prolonged, is likely to induce violence, is against the public policy and against the peace and dignity of the State of North Dakota and is subject to restraint by the District Court of the State of North Dakota as an exercise of the police power reserved to the State of North Dakota, which conduct the defendants and each of them are hereby permanently enjoined, restrained and prohibit from carrying on."

It is contended that the evidence does not show any need for the use of the police power, that no acts of violence are shown. However, Justice Douglas in Local Union No. 10, United Ass'n of Journeymen, Plumbers, etc. v. Graham, 345 U.S. 192, 73 S.Ct. 585, 590, 97 L.Ed. 946, while disagreeing with the court on the facts found, concluded:

"If this union used the coercive power of picketing to force contractor to discharge the nonunion men who were employed on the job, Virginia could

issue the injunction. For it is within the police power of the state to keep opportunities for work open to both nonunion and union men." See Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed 834; Building Service Emp. Intern. Union, Local 262 v. Gazzam, 339 U.S. 532, 70 S.Ct. 784, 94 L.Ed. 1045.

As will be shown hereafter, it was to keep these opportunities open that the injunction was granted.

Picketing, as used in connection with labor disputes, has been said ·to mean the establishment and maintenance of an organized espionage by a union upon the works of an employer and of persons going to and from them and thereby to force him to come to the terms of the union. The term, "picketing," may be used in the sense of stationing persons for the purpose of accomplishing such things by coercion or intimidation. 31 Am.Jur.Labor, Section 223, p. 943. See Annotation 83 A.L.R. 200. The evidence shows that the picketing involved was being carried on against the public policy of ·the State of North Dakota.

In addition to the police power there is another area left open to the state in which it can act to prevent any violation of the declared public policy.

 The union shop and enforcement of union security and membership is left open to the state by the provisions of the National Labor Relations Act. A closed shop is one where only union members may be hired. A union shop is one where the employer is allowed to hire non-union men but they must join the union within a limited number of days, usually 30 days. A closed shop is prohibited but a union shop under certain conditions is permitted by that act. Title 29 U.S.C. § 158(a) (3), p. 4459, 29 U.S.C.A. § 158(a) (3), 61 U.S. Statutes, Chapter 120, Sec. 8(a) (3), p. 140 provides:

"It shall be an unfair labor practice for an employer—

"(1) * * *

"(2) * * *

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this Act, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in section 8(a) of this Act as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 9(a), in the appropriate collective-bargaining unit covered by such agreement when made; and (ii) if, following the most recent election held as provided in section 9(e) the Board shall have certified that at least a· majority of the employees eligible to vote in such election have voted to authorize such labor organization to make such an agreement."

This section prohibits the closed shop and places conditions on the establishment of the union shop. There are, however, limitations provided in this connection. 61 U.S. Statutes, Chapter 120, Sec. 14(b), p. 151, 29 U.S.C.A. § 164(b) provides:

"Nothing in this act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as, a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law."

This section was analyzed in Algoma Plywood & Veneer Co. v. Wisconsin Emp. Relations Board, 336 U.S. 301, 69. S.Ct. 584, 93 L.Ed. 691. That was an action brought up on certiorari from the Supreme Court of Wisconsin. Wisconsin Employment Relations Board v. Algoma Plywood & Veneer Co., 252 Wis. 549, 32 N.W.2d 417. That

case also involved interstate commerce and a union security agreement. The company had entered into a labor contract with its employees containing a provision that all the employees were members of the union in good standing and as a condition of employment should remain members of the union in good standing, which is the so-called maintenance-of-membership clause. One employee had become delinquent in his payments and was notified that if he was not paid up within a week that would be "your last day of work and you will also be fined $1." He did not pay. He stated he would quit before he would pay. He indicated dissatisfaction with the union. He was then discharged. He then made application to the Wisconsin Employment Relations Board charging the company with unfair labor practice under Wisconsin Statutes, Sec. 111.06(1) (c) 1 which provides:

"It shall be unfair labor practice for an employer * * * to encourage * * * membership in any labor organization * * * by discrimination in regard to hiring, tenure or other terms or conditions of employment; provided, that an employer shall not be prohibited from entering into an all-union agreement with the representatives of his employees in a collective bargaining unit, where at least two-thirds of such employees voting * * * shall have voted affirmatively by secret ballot in favor of such all-union agreement in a referendum conducted by the board. *. * *"

Such referendum had not been taken.

The board ordered the employer to cease and desist from giving effect to maintenance-of-membership clause in the contract. A state circuit court affirmed that order. On appeal the state supreme court held:

"Section of National Labor Relations Act defining unfair labor practices was not intended to interfere with policy of the states in respect of closed shop and all-union agreements, and does not delegate to either the War Labor Board or the National Labor Relations Board

any jurisdiction to declare a policy in respect of maintenance of membership, closed shop or *all union shop*. National Labor Relations Act, Sec. 8(3), 29 U.S.C.A. § 158(3)." (Emphasis supplied.)

On certiorari the Supreme Court of the United States in that case traced the history of the National Labor Relations Act, The Wagner Act, and made reference to the senate report and the statements there shown to have been made by the proponents of the Act indicating that there was no intent by congress to legalize the closed shop wherever prohibited by the laws of any state. The court then said [336 U.S. 301, 69 S.Ct. 590]:

"Since we would be wholly unjustified, therefore, in rejecting the legislative interpretation of § 8(3) placed upon it at the time of its enactment, it is not even necessary to invoke the principle that in cases of concurrent power over commerce state law remains effective so long as Congress has not manifested an unambiguous purpose that it should be supplanted. See, e. g., Sinnot v. Davenport, 22 How. 227, 16 L.Ed. 243; Missouri, K. & T. R. Co., Haber, 169 U.S. 613, 18 S.Ct. 488, 42 L.Ed. 878."

After reviewing the restrictive clauses of the Wagner and Taft-Hartley Acts the United States Supreme Court comes to the conclusion that:

"Other provisions of the Taft-Hartley Act make it even clearer than the National Labor Relations Act that the States are left free to pursue their own more restrictive policies in the matter of union-security agreements. Because § 8(3) of the new Act forbids the closed shop and strictly regulates the conditions under *which a union-shop agreement may be entered, § 14(b) was included to forestall the inference that federal policy was to be exclusive.*" (Emphasis supplied.)

In that area our pioneers early recognized the necessity of giving labor some

protection in its economic contest for a living. Sec. 23 of the North Dakota Constitution provides:

"Every citizen of this state shall be free to obtain employment wherever possible, and any person, corporation, or agent thereof, maliciously interfering or hindering in any way, any citizen from obtaining or enjoying employment already obtained, from any other corporation or person, shall be deemed guilty of a misdemeanor."

Later when industrial troubles arose in the east, the North Dakota legislature passed Chapter 247, 1935 S.L. granting preventive relief in labor disputes. This act has been amended and re-enacted, appearing now as Chapter 34-08, NDRC 1943, with some amendments in the 1949 and 1953 Supplements. The policy of this state in regard to those laws is set out in Sec. 34-0802, NDRC 1943:

"For the purpose of the interpretation of the provisions of this chapter, the public policy of this state is declared to be that a worker of this state shall be free to decline to associate with his fellows, but that he also shall have full freedom of association, self organization, and designation of representatives of his own choosing to negotiate the terms and conditions of his employment, and that he shall be free in such matters, as well as in other concerted activities for the purposes of collective bargaining or other mutual aid or protection, from interference, restraint, or coercion by employers of labor or their agents."

The statutes enacted to carry out this policy must be interpreted in harmony with the policy declared by the legislature.

In furtherance of the policy so adopted the legislature has enacted the following statutes:

Sec. 34-0901, NDRC 1943, 1949 Suppl. provides that:

"The public policy of this state is declared to be that a worker shall be free to decline to associate with his fellows and shall be free to obtain employment wherever possible without interference or being hindered in any way, but that he shall also have the right to association and organization with his fellow employees and designation of representatives of his own choosing."

Sec. 34-0114, NDRC 1953 Suppl., Approved on Referendum June 29, 1948, provides that:

"No person shall be deprived of life, liberty or property without due process of law. The right of persons to work shall not be denied or abridged on account of membership or nonmembership in any labor union or labor organization, and all contracts in negation or abrogation of such rights are hereby declared to be invalid, void and unenforceable."

■ It is clear that the legislature of North Dakota adopted for the state a public policy of protecting the worker in his right to work free of any interference and control by either employers or labor organizations. He has a right to join his fellows in organization for the betterment of his condition and to choose his own representatives for that purpose. He also has the right to decline to join any organization and to obtain and retain employment wherever he chooses.

■ Both closed and union shops are prohibited under these North Dakota laws. Any attempt to impose an all union shop or to procure a contract of employment requiring or resulting therein is in defiance of the clear, public policy of this state.

The next question is whether the establishment of a union shop was involved in the dispute here under consideration. On that matter the district court made the following findings of fact:

"12. Immediately prior to August 21, 1953, the Defendant unions demanded that Signal employ only union labor on the project.

"13. Immediately prior to August 21, 1953, the Defendant unions demanded that Signal contract for work on the project only with contractors who employed exclusively union labor.

"14. Immediately prior to August 21, 1953, the Defendant unions demanded that Signal either (1) cancel the contract of Plaintiff Oil Field Service Co., or (2) compel Plaintiff, Oil Field Service Co., to employ exclusively union labor.

"15. Immediately prior to August 21, 1953, the Defendant unions informed Signal that unless all non-union contractors were moved from the job or compelled to employ only non-union labor, the Defendant unions would picket and banner the project, as unfair to organized labor.

"18. At all times material hereto Signal refused Defendant unions' demands that it cancel its contract with Plaintiff Oil Field Service Co., and refused the unions' demands that it compel Plaintiff, Oil Field Service Co., to employ exclusively union labor.

"19. Immediately prior to August 21, 1953, the Defendant unions demanded that Plaintiff, Oil Field Service Co., employ exclusively union labor on the project."

Some of the evidence on which these findings are based has been heretofore quoted and a careful review of all the evidence shows that these findings are amply supported by the evidence of the conversations had at the meetings and the sample contracts submitted as heretofore stated. The picketing of the defendants was for the purpose of forcing a union shop requiring membership in the labor organization as a condition of employment. Not only did they make a demand for union shop but they also threatened that no union member would be permitted to work on the project as long as there were non-union members working there and further no union members would be permitted to work on any project that had been built by non-union labor or by non-union contractors. Finally they gave Signal Oil & Gas Co., a time limit of one day to meet their demands. When that time limit expired the picketing started. A union shop had to be established before the defendants could be elected representatives to do any bargaining for plaintiff's employees.

Clearly the purpose of that picketing was the establishment of a union shop which is illegal under our statutes hereinbefore cited.

In addition to those statutes, Section 34-0105, NDRC 1943, makes it a misdemeanor for any person to prevent another by intimidation from employing a person, and Section 34-0106, NDRC 1943, makes it a misdemeanor for any person to maliciously interfere with or hinder any citizens in any way from obtaining employment or enjoying employment already obtained.

 Under all these statutes picketing to induce the plaintiff to force a labor union on his employees, which would interfere with their right to work, or force them to join a union without their free will, was illegal. The action of the defendants amounted to the use of picketing for coercion to further an illegal purpose as expressed by our Constitution and law here set forth.

In the case at bar the purpose of the picketing was to exert pressure on the Signal Oil & Gas Co., the employers of the plaintiffs, by interfering with their business and thereby forcing them to discharge plaintiffs or to unionize the project. It was successful in causing the truck driver to refuse to cross the picket line with a load of steel materials for fear he would be fined or fired from the union. Similarly the employees of the railroad refused to bring in a car of cement.

Even if the purpose of the picketing is illegal and comes within an area left open to the state, it is argued that since the defendants had no authority to represent the plaintiffs or to do any bargaining for plain-

tiff's employees, defendants' conduct in trying to force a union shop should be measured by the unfair practices prohibited by the Taft-Hartley Act and that, therefore, jurisdiction in this matter was with the National Labor Board. That would be true if the conduct designated "unfair labor practice" under the Taft-Hartley Act was used to prevent the accomplishment of some objective protected by that Act. It should be noted that the unfair practices prohibited by the Taft-Hartley Act involved conduct carried on for the purpose of preventing some objective protected by that act. For instance, bargaining by agencies not certified as representatives of a union as required by Section 9(a), Chapter 120, 61 U.S.Statutes p. 143, was made an unfair labor practice to protect the union in the matter of bargaining. An attempt to cause an employer to discriminate against an employee because of membership or non-membership in a labor organization, Section 8 (a) (3), was made an unfair labor practice to protect the laborer in his right to work irrespective of union membership. The conduct of the defendants in the instant case was not against an objective protected by the Taft-Hartley Act. It was for an objective definitely excluded by that act. The picketing here was for the establishment of a union shop in contravention of the North Dakota law which is in a field excepted from the Taft-Hartley Act. 61 U.S.Statutes, p. 151, Chapter 120, Section 14(b), 29 U.S.C.A. § 164(b). The requirements for elective representatives of the employees, the designation of unfair labor practices in the matter of discrimination because of membership in a union and in other ways do not, therefore, apply. As said by Professor Forkosch in A Treatise on Labor Law, p. 336: "Section 14(b), however, must not be overlooked. Although Sec. 8(a) (3), permits union shop contracts, Section 14(b) permits states to forbid and outlaw their execution or enforcement within their border. Thus in states which have outlawed union shop agreements, Sec. 8(b) (2), does not operate to deter unions from setting whatever membership qualifications they desire; in short, the *section becomes irrelevant in those states."* (Emphasis supplied.)

An examination of the cases cited in support of the contention that the conduct of the defendants by picketing plaintiffs' plant was an unfair labor practice under the Taft-Hartley Act shows that the conduct in those cases was for the purpose of preventing an end that was protected by the Taft-Hartley Act. Local 74, United Brotherhood of Carpenters & Joiners of America v. National Labor Relations Board, 341 U.S. 707, 71 S.Ct. 966, 95 L.Ed. 1309; National Labor Relations Board v. Local Union No. 55, 10 Cir., 218 F.2d 226. In neither of those cases was the purpose of the picketing specially excluded from the Taft-Hartley Act as in the case at bar.

It clearly appears to us that these unfair labor practices in the Taft-Hartley Act do not in any way apply when the objective is the accomplishment of an illegal purpose as in the case at bar, a purpose left free for control by the state. Sec. 14(b), and not against an objective protected by the Taft-Hartley Act.

The case of Garner v. Teamsters, Chauffeurs & Helpers, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228, has been cited as authority for the preemption of this matter under the Labor Management Relations Act. The facts differentiate that case from the case at bar. In the Garner case the proceedings were brought in the Pennsylvania Equity Court under the Pennsylvania Labor Relations Act, 43 P.S.Pa. § 211.1 et seq. The issue involved the picketing of a trucking concern involving unfair labor practices for which remedies were prescribed both by the Labor Management Relations Act and the Pennsylvania Labor Relations Act. The objective sought was protected by both acts. In such cases the procedure is preempted by the Taft-Hartley Act. No area left free to the states was involved. Bethlehem Steel Co. v. New York State Labor Relations Board, 330 U.S. 767, 67 S.Ct. 1026, 91 L.Ed. 1234.

In the case of Local Union No. 10, United Ass'n of Journeymen, Plumbers, etc., v. Graham, 345 U.S. 192, 73 S.Ct. 585, 97 L.Ed. 946, the situation was exactly the same as in the case at bar. The state court proceed-

ed without any consideration of the Taft-Hartley Act, and its decision was affirmed. The question was whether the Commonwealth of Virginia "may enjoin peaceful picketing when it is carried on for purposes in conflict with the Virginia Right to Work Statute [Code 1950, § 40–68 et. seq.]." The Graham firm of contractors were building a school in the City of Richmond and had made contracts with some subcontractors employing non-union as well as union labor. The union had demanded that the non-union labor be laid off and that unless that were done " 'every effort would be made to prevent any union labor employed * * * on that project from continuing work thereon.' " When that was not done picketing and bannering the project was started. The Virginia Right to Work Statute provides, Sec. 1, " 'It is hereby declared to be the public policy of Virginia that the right of persons to work shall not be denied or abridged on account of membership or nonmembership in any labor union or labor organization' " and the act further provides that any violation thereof is illegal and makes the offender subject to criminal and civil liabilities. An action was brought by the contractors in the Law and Equity Court of the City of Richmond for an injunction restraining the picketing. The Equity court found: "That the picketing complained of was conducted and carried on for aims, purposes and objectives in conflict with the provisions of the Right to Work laws of the State of Virginia and therefore illegal, that a permanent injunction is necessary to prevent irreparable harm and damage to the complainants." The injunction was granted.

The Supreme Court of Appeals of Virginia on appeal affirmed the decree of the lower court.

The case was taken to the United States Supreme Court on certiorari. The opinion of the Supreme Court of the United States, concludes:

"Based upon the findings of the trial court, we have a case in which picketing was undertaken and carried on with at least one of its substantial purposes in conflict with the declared policy of Virginia. The immediate results of the picketing demonstrated its potential effectiveness, unless enjoined, as a practical means of putting pressure on the general contractor to eliminate from further participation all nonunion men or all subcontractors employing nonunion men on the project."

The opinion does not state that interstate commerce was involved but Section 14(b) and the Virginia Right to Work law are set forth in the margin of the opinion. If the case involved interstate commerce it is clear that the court thought that 14(b) left state courts free to enjoin picketing carried on contrary to the right to work law of Virginia. If it did not involve interstate commerce the opinion supports the right of the state court, when left free to act, to enjoin such illegal picketing.

While picketing under certain conditions may be lawful we find that it is generally held that picketing carried on for an unlawful purpose may be enjoined. 1 Teller, Labor Disputes and Collective Bargaining, Sec. 114, p. 346, 31 Am.Jur. Labor, Sec. 230, p. 948.

In Dorchy v. State of Kansas, 272 U.S. 306, 47 S.Ct. 86, 87, 71 L.Ed. 248, Justice Brandeis says:

"The right to carry on business—be it called liberty or property—has value. To interfere with this right without just cause is unlawful. The fact that the injury was inflicted by a strike is sometimes a justification. But a strike may be illegal because of its purpose, however orderly the manner in which it is conducted."

This applies to picketing as well as striking. In Peters v. Central Labor Council, 179 Or. 1, 169 P.2d 870, 873, the court says:

"We agree with appellants that picketing, even though peacefully conducted, ought to be enjoined if it is for an unlawful purpose. Ever since the enactment of the Anti-Injunction Act, this court has consistently held that picketing must be for a lawful purpose,

(Citing cases.) There is no decision of the United States Supreme Court to the contrary."

In Retail Clerks' Union, etc. v. Wisconsin Employment Relations Board, 6 N.W.2d 706, it is held:

"It is generally held that coercion or intimidation is not necessarily limited to threats of violence to persons or property. A man may be coerced into doing or refraining from doing by fear of the loss of his business, or wages as well as by the dread of physical violence or force. 6 A.L.R. 920; 116 A.L.R. 489. It is there said: ' * * that coercion is as easily accomplished without threats of violence as with them, and fear of loss or injury to business unless one submits to demands is as effective as fear of violence to his person.' Anderson & Lind Mfg. Co. v. Carpenters[' Dist. Council,] 308 Ill. 488, 139 N.E. 887; Webb v. Cooks' Waiters' and Waitresses' Union, Tex. Civ.App., 205 S.W. 465, 467; Barr v. Essex Trades Council, 53 N.J.Eq. 101, 111, 30 A. 881; Truax v. Corrigan, 257 U.S. 312, 321, 328, 42 S.Ct. 124, 66 L. Ed. 254, 258, 260, 27 A.L.R. 375." See also Lisse v. Local Union No. 31, Cooks, Waiters & Waitresses, 2 Cal.2d 312, 41 P.2d 314.

In Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 69 S.Ct. 684, 690, 93 L.Ed. 834, a state court enjoined officers and members of a union of ice peddlers from peaceful picketing the defendants' and appellees' place of business. The court found that the sole purpose of the picketing was to induce appellees to agree not to sell to non-union peddlers. The state supreme court affirmed the injunction holding that picketing for this purpose violated the state statute forbidding agreements in restraint of trade. The Supreme Court of the United States said:

"We think the circumstances here and the reasons advanced by the Missouri courts justify restraint of the picketing which was done in violation of Missouri's valid law for the sole

immediate purpose of continuing a violation of law."

In Building Service Emp. Intern. Union, Local 262 v. Gazzam, 339 U.S. 532, 70 S. Ct. 784, 789, 94 L.Ed. 1045, a state court granted an injunction against peaceful picketing by a labor union for the particular purpose of compelling an employer to sign a contract which would coerce his employees' choice of a bargaining representative. The court said:

"Here, as in Giboney, the union was using its economic power with that of its allies to compel respondent to abide by union policy rather than by the declared policy of the state. That State policy guarantees workers free choice of representatives for bargaining purposes. If respondent had complied with petitioners' demands and had signed one of the tendered contracts and lived up to its terms, he would have thereby coerced his employees. The employees would have had no free choice as to whether they wished to organize or what union would be their representative."

The injunction was upheld. See also Grandview Dairy v. O'Leary, 158 Misc. 791, 285 N.Y.S. 841; Louis Daitch & Co. v. Cohen, 218 App.Div. 80, 217 N.Y.S. 817; Heitkemper v. Central Labor Council, 99 Or. 1, 192 P. 765.

■ It is claimed by the appellants that the injunction interferes with constitutional right of free speech. The free speech involved in the case at bar is that means of communication adopted by labor in the carrying of placards or banners in connection with picketing. It is done to proclaim to the public what the unions claim to be wrongful action by the party that is being picketed. In the case at bar the banners read: "This project unfair to organized labor." The only effect of the injunction on this procedure was the restraint of maintaining a rotating picket line back and forth, across and directly in front of the plant entrances, carrying such a banner. Such rotation of pickets, holding such a banner

would interfere with the free ingress and egress to the plaintiffs' plant and aid in intimidation of those who would enter the plant. There is no provision restraining the defendants from carrying such banner as they did, as long as they were not rotating in front of the entrances where the carrying of such a banner would aid in intimidation and coercion upon the plaintiff.

In Retail Clerks' Union, etc. v. Wisconsin Employment Relations Board, 242 Wis. 21, 6 N.W.2d 698, 706, 149 A.L.R. 452, 462 it was held that unlawful picketing was not protected by the guarantee of free speech. The court said:

"Peaceful picketing is now recognized as an exercise of the right of free speech and therefore lawful. Thornhill v. State of Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093; Carlson v. [People of] State of California, 310 U.S. 106, 60 S.Ct. 746, 84 L.Ed. 1104; A. F. of L. v. Swing, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855; Milk Wagon Drivers Union[, etc.] v. Meadowmoor Dairies, 312 U.S. 287, 61 S.Ct. 552; 85 L.Ed. 836, 132 A.L.R. 1200; Bakery and Pastry Drivers and Helpers Local [802, etc.] v. Wohl, 315 U.S. 769, 62 S.Ct. 816, 86 L.Ed. 1178; Carpenters and Joiners Union [of America, Local No. 213] v. Ritter's Cafe, 315 U.S. 722, 62 S.Ct. 807, 86 L.Ed. 1143. However it cannot be made the cover for concerted action against an employer in order to achieve an unlawful or prohibited object, such as to compel an employer to coerce his employees to join a union. Hotel and Restaurant Employees' International Alliance[, etc.] v. Wisconsin Employment Relations Board, 315 U.S. 437, 62 S.Ct. 706, 86 L.Ed. 946, which affirmed the same case in 236 Wis. 329, 294 N.W. 632, 295 N.W. 634; Wisconsin Employment Relations Board v. Milk, etc., Union, 1941, supra [238 Wis. 379, 299 N.W. 31]."

In Bomes v. Providence Local No. 223 of Motion Picture Machine Operators of United States and Canada, 51 R.I. 499, 155 A. 581, 583, it is said:

"Granting that peaceful picketing is lawful and the display of placards of the kind in question on the public street is lawful, all the authorities agree that such actions are unlawful when accompanied by coercion or intimidation. Goldberg, [Bowen &] Co. v. Stablemen's Union, 149 Cal. 429, 86 P. 806, 8 L.R.A.,N.S., 460, 117 Am.St.Rep. 145, 9 Ann.Cas. 1219; St. Germain v. Bakery & Confectionery Workers' Union, 97 Wash. 282, 166 P. 665, L.R.A.1917F, 824; Bull v. International Alliance, 119 Kan. 713, 241 P. 459; Steffes v. Motion Picture Machine Operators Union, 136 Minn. 200, 161 N.W. 524."

In Hanke v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local 309, 33 Wash.2d 646, 207 P.2d 206, the court said that:

"Peaceful picketing of employer's place of business for purposes of forcing employees to join labor union or compelling employer to enter into contract which would in effect compel employees to become members of such union is not protected by constitutional guarantee of free speech. U.S.C.A. Const. Amends. 1, 14."

This holding was affirmed on certiorari by the United States Supreme Court, 339 U.S. 470, 70 S.Ct. 773, 94 L.Ed. 995. See also International Brotherhood of Electrical Workers, etc. v. National Labor Relations Board, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299, and cases cited. Pappas v. Stacey, 151 Me. 36, 116 A.2d 497; Milwaukee Boston Store Co. v. American Federation of Hosiery Workers, 269 Wis. 338, 69 N.W.2d 762.

The appellants claim that the injunction should have been denied on equitable grounds; that the plaintiffs did not come into court with clean hands. Appellants name eight specific charges against Diederich & Bye to show hostilities to union labor and that they in effect refused to employ union men. Diederich & Bye, however, are no longer parties to this action. They are not asking for an injunction now. Their acts have now no bearing

on the question of an injunction for the future.

The appellants cite four instances in which Mr. Minor of the Oil Field Service Co., is claimed to have been unfair to organized labor and that he had refused to hire union employees, thus unlawfully discriminating against union labor. These statements are disputed by Mr. Minor. At the most they indicate that Oil Field Service Co., was not hiring any men, union or non-union, at that particular time. Even if the statements of Mr. Minor were given the interpretation claimed by the defendants that would not constitute any equitable excuse for the performance of the illegal acts claimed by the plaintiffs to have been done by the defendants. In Gill Engraving Co. v. Doerr, D.C., 214 F. 111, 112, the court held:

"That the proprietor of a photo engraving business, seeking relief against the acts of a labor union claimed to have injured it, had discharged and refused to employ union engravers did not deprive it of the aid of equity."

Much stronger acts by plaintiffs against the union have been held insufficient to deny the plaintiffs an injunction against illegal acts. See Cooks', Waiters' & Waitresses' Local Union v. Papageorge, Tex.Civ.App., 230 S.W. 1086; New York Central Iron Works Co. v. Brennan, Sup., 116 N.Y.S. 457; Lauf v. E. G. Shinner & Co., 7 Cir., 82 F.2d 68.

The evidence shows the provisions of the North Dakota laws relating to labor injunctions have been carried out. Secs. 34-0803, 34-0805, and 34-0807, NDRC 1943.

The bases for an injunction therein set forth existed. Unlawful picketing against the plaintiffs had been committed and will be continued unless restrained. Such picketing threatens further trouble and injuries. This picketing caused delay in getting the building covered before winter from which delay substantial, irreparable injuries to the plaintiffs would follow for which they have no adequate remedy at law, as such damages are hard to determine. Greater injury will result to the plaintiffs than to the defendants by denial of the relief. Peace officers were unable or unwilling to stop the picketing. While the pickets, on notification to the sheriff, were removed from one entrance they remained at the others. The injunction was properly granted.

The judgment of the district court is affirmed.

SATHRE, J., concurs.

JOHNSON, Judge (concurring).

I concur in the opinion prepared by Judge GRIMSON, but I desire hereby to present some additional reasons for the affirmance of the judgment.

My discussion may well begin by asking, what was the primary purpose of the attempt by the defendant union representatives in negotiating with representatives of Signal Oil and Gas Company, J. F. Pritchard Company, Oil Field Service and Diederich and Bye?

Mr. Miller of Signal Oil and Gas Company testified at length. Several informal meetings had taken place between the parties. But the meeting of August 19, 1953, brought the issue to a head. At that meeting the plaintiffs were not present.

In an attempt to get at the primary objectives of the defendants, statements of Mr. Miller are pertinent. He was asked:

"All right, sir, at the first meeting, what subject of business did the union representatives bring up for discussion? A. Well, they protested the use of non-union labor and non-union contractors on our construction work at the plant at Tioga." * * *

"Q. All right, sir, now which ones—did they all concur in the statements? Did they all make similar statements? A. Well, yes it was all agreed on that they protested the use of non-union contractors and non-union laborers on our Tioga gasoline plant.

"Q. Well, with regard to the negotiations that were held at each of these, the discussions that were held at each of these meetings, was it a matter of first taking up the matter of one craft and then taking up the matter of another craft and then taking up the matter of a third craft, or were they all discussed together at one time? A. No, sir, those gentlemen wanted this to be a union job complete, total in all its phases.

"Q. And then— A. (Continuing) They objected to the use of Oil Field Service and Diederich and Bye who were non-union contractors.

"Q. All right, sir, did they tell you that they wanted this to be an exclusively union job? A. Yes, sir."

"The Witness: I believe in that part of the discussion Mr. Johnson was active. He seemed concerned that my company should sign a contract for any work on this job that wasn't already agreed upon to be a union arrangement. He also expressed some concern that the contract itself did not have a clause in it which would permit me to stop it because it was not a closed shop deal where all the people belonged to the union. I kept insisting with those men all along that that was out of my sphere, for authority and that was—well, they thought that was quite an argument. They thought I had the authority to do that. I insisted that I didn't. So there was a lot of confusion because many people were talking. Well, at that meeting Mr. Taylor was there and I said to Taylor, I said, 'Don't you believe that this is out of my scope?' 'Yes.' But if we could get something concise, pin-pointed from what these people were demanding, we would at least present it to the management. That's where the samples of these contracts were submitted * * *."

Mr. Miller explained that one Mr. Rush, a representative of the International Brotherhood of Electrical Workers, had explained that the Minot Labor Council had already authorized them to banner the job if they did not accomplish a satisfactory contract with the Oil Field Service and Diederich and Bye that day (August 19). He also stated that Mr. Johnson of the Carpenters Union said that he would, in Williston that night, move at the meeting that the job be bannered, if something was not done about the foundation being done by non-union men.

"Q. When they told you that they wanted you either to get rid of the Plaintiffs or to induce them to sign a contract. Did they give you a specimen of the kind of contract they wanted you to get the Plaintiffs to sign? A. Those are part of the contracts that are submitted.

"Q. Mr. Miller, at the meetings that we have been discussing, did the union representatives demand of you that Signal Oil and Gas Company require that all of the contractors on the project to employ entirely union labor?

Objection.

"A. Yes, sir."

There is no substantial testimony in the record that the defendants were attempting to compel the plaintiffs to recognize them as bargaining agents. If such a conclusion is to be reached, it must be based on inference. The defendant union representatives were asking for a closed or union shop and seeking contracts that would make it so. They were interested in an *all union* job.

It is true that at the time of the trial of this action testimony was elicited indicating a willingness on the part of the defendants to meet with the employers, and also negativing any intent to violate the state law and the public policy thereby established. This testimony is mostly of a self-serving nature. It amounts to saying: "We did not intend to do what was done."

When the entire testimony is considered it is clearly apparent that the purpose of the negotiations was to obtain an *all union job* at the Signal Oil and Gas Company

plant. The specimen contracts that were given to Mr. Miller either at his request or as an indication of what the unions wanted, provided for a closed shop or a union shop, or at most provided an escape clause if these were illegal under state law. The specimen contract attached to the complaint was one involving a closed shop.

The negotiations never proceeded to the point where the defendants requested either Signal Oil and Gas Company, the Oil Field Service, or Diederich and Bye to sign a closed shop or union contract. But the threat to banner and picket the job was made in negotiations that clearly indicate that the unions were concerned *primarily* about obtaining that kind of an arrangement.

When the plaintiffs failed to appear at the August 19, 1953, meeting at the field house of the Signal Oil and Gas Company plant, apparently the unions felt that to force the issue they must banner and picket the plant. If the bannering and picketing did not have for its purpose to force Signal Oil and Gas Company to induce the plaintiffs to enter into contracts that would make the job an all union one, it had no purpose at all. The testimony shows that not only did the representatives of the unions request that this be an all union job, but time after time attempted to get the Signal Oil and Gas Company, through Mr. Miller, to use its influence with the contractors doing the work to make it an all union job, or if they would not, then to cancel their contracts with the plaintiffs because they were employing non-union men.

The trial court found, and its findings are supported by ample evidence:

"34. The primary objectives of the Defendant labor unions and representatives were:

"a. To negotiate union security contracts with Plaintiff Oil Field Service Co. for the employment of union labor exclusively with respect to crafts employed by the Plaintiffs.

"b. To persuade Signal to require the Plaintiffs to negotiate union secu-rity contracts with the Defendants for the employment of union labor exclusively.

"c. To force or require Signal to cease doing business with Plaintiff Oil Field Service Co.

"35. The Defendants attempted by negotiation, without success, to accomplish the foregoing objectives."

None of the unions attempting to negotiate represented the employees of the plaintiffs nor were they certified representatives of anyone, as required by the Taft-Hartley Act. It is obvious that before there can be a bargaining representative of a union there must, of course, be an established union in existence. No union had been established among the employees of the plaintiffs. Any attempt to force the formation of a union is illegal under North Dakota law.

It is argued that since the defendant sought by means of picketing, bannering and other methods to force and induce the employees of carriers transporting commodities and other materials to the site of the Signal Oil and Gas Company and to engage in a refusal in the course of their employment, because of the picketing and bannering, to transport and otherwise handle materials and commodities consigned to the plaintiffs, the objective of which was to coerce or force the Signal Oil and Gas Company to cease doing business with the plaintiffs, such activities constituted unfair labor practices as defined by Section 8(b) (4) of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 158(b) (4). The trial court found this to be the case. Other acts of the defendants are pointed out as unfair labor practices. It is further argued that these unfair labor practices constitute the *entire demand* upon the Signal Oil and Gas Company and the plaintiffs; that no actual bargaining took place, and no specific contracts were demanded of either the plaintiffs or the Signal Oil and Gas Company; and that the bannering and picketing of the plant constituted secondary pressure on Signal Oil and Gas Company. The company did not employ any men directly, but of course they were

interested in the expeditious completion of the plant. But the facts show the primary objectives to be the attainment of an all-union job. The defendants wanted contracts that would make it so. That was the first requirement. Other considerations were left to abide that objective.

The main point at issue is whether or not the unfair labor practices involved in this controversy, which involved interstate commerce, deprive the state court of jurisdiction to enjoin the defendants.

Our public policy is clearly established by Section 23 of the North Dakota Constitution and Sections 34-0106, NDRC 1943, 34-0114, NDRC 1953 Supp., 34-0802, NDRC 1943, and 34-0901, NDRC 1953 Supp. Under our Constitution and our statutes both the closed shop and the union shop are illegal. Section 34-0114, NDRC 1953 Supp.

Under circumstances such as exist here, where some of the acts that took place constitute unfair labor practices under the Taft-Hartley Law and where the same acts are illegal under the declared public policy of the State of North Dakota under the "right to work" act and other statutes, is the controversy involved one subject solely to the jurisdiction of the National Labor Relations Board under the Taft-Hartley Act, or does the illegality or attempt to procure contracts violating the "right to work" law and contrary to our public policy, give the employers a choice of remedies under the state law or the Taft-Hartley Act, depending upon which ground of illegality they may want to assert? That is the crucial issue in this controversy.

The violations of the Taft-Hartley Act involved in this controversy are clearly distinct from the attempted violations to procure contracts that are illegal, void, and contrary to the public policy of the State of North Dakota.

While the injunction in this case was justified by the trial court primarily on the basis of the state's police power, the question arises as to whether or not the court was within its jurisdiction to issue the injunction to protect, maintain, and enforce the declared public policy of this state. It is my opinion that the trial court had such jurisdiction. If the violations under the Taft-Hartley Law and the violations under the declared public policy of this state, particularly the "right to work" law, Section 34-0114, NDRC 1953 Supp., had covered the same area, then under the cases there is no doubt that this being a controversy involving interstate commerce, the state court would have no jurisdiction.

If as the trial court found, the primary objectives of the bannering and picketing were to procure union security contracts with the plaintiffs, Oil Field Service Company and Diederich and Bye, for the employment of union labor exclusively with respect to the crafts employed by them, and to persuade the Signal Oil and Gas Company to require the plaintiffs to negotiate union security contracts, and to force or require them to cease doing business with the plaintiffs, did the trial court have jurisdiction, or was the jurisdiction of the controversy pre-empted under the Taft-Hartley Act?

Under Chapter 120, Section 14(b), page 151, 61 U.S.Statutes, 29 U.S.C.A. § 164 (b), it is provided:

"Nothing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law."

The execution or application of closed or union shop contracts is prohibited in North Dakota. This is commonly referred to as the "right to work" law, Section 34-0114, NDRC 1953 Supp.

Does Section 14(b) cede to the states complete jurisdiction in a controversy in which the primary objective is to obtain contracts in violation thereof? Or put another way, does the Taft-Hartley Act, because it only in a limited sense covers the

same area as our "right to work" law, although the legal effect is entirely different, bar the state from taking jurisdiction?

If the Congress intended to give the states a free hand in the area covered by Section 14(b) it must have intended that the states have the right to enforce, maintain and protect any policy adopted pursuant to that section. In other words, is this an area under the Taft-Hartley Act which has been ceded to the states, free from any federal interference under that act? It is an area in labor relations which is not recognized by the Taft-Hartley Act. It is an area referred to in a specific exclusion. If the area is exclusive to a state, then it must follow that the state must have the right to protect, maintain, and enforce it. The Taft-Hartley Act does not provide for any maintenance, protection or enforcement of the "right to work" laws as promulgated by the states.

If that be true, even though the violations which are here involved also cover some areas under the Taft-Hartley Act, that becomes immaterial since the area left to the states must be assumed to be complete. The protection of this area, its maintenance and enforcement by a state is in no *sense a duplication* upon any power or authority set out or covered by the federal law. It is not a field that is protected, prohibited, or in conflict with its provisions. It is an area left to the states.

In the case of Weber v. Anheuser-Busch, Inc., 348 U.S. 468, 75 S.Ct. 480, 484, 99 L. Ed. 546, the Supreme Court of the United States analyzed some of the leading cases. It said:

"1. The Court has ruled that a State may not prohibit the exercise of rights which the federal Acts protect. Thus, in Hill v. State of Florida ex rel. Watson, 325 U.S. 538, 65 S.Ct. 1373, 1375, 89 L.Ed. 1782, the State enjoined a labor union from functioning until it had complied with certain statutory requirements. The injunction was invalidated on the ground that the Wagner Act included a 'federally establish-

ed right to collective bargaining' with which the injunction conflicted."

No right exists in this state to bargain for the purpose here expressed.

The Taft-Hartley Act does not protect the "right to work" as determined by our public policy. It is true that it prohibits the closed shop and protects the union shop if certain conditions are complied with as required by the act, but it does not completely protect in the sense that our statutes do, the "right to work". It would, therefore, seem that a state may by injunction protect, maintain, and enforce its public policy, and that this is not in any sense a conflict with the Taft-Hartley Act.

While it may be conceded that the picketing in the case at bar constituted unfair labor practice under the federal statutes, it, at the same time was not such picketing, under our state law, because it had for its objective the attainment of illegal contracts prohibited by law. The objectives sought are not only unfair labor practices but are completely prohibited. In any event the unions were attempting to obtain a result in a manner prohibited by the Taft-Hartley Act and by the state law. But the prohibition under our law is of much greater scope than any violation of the Taft-Hartley Act.

In Garner v. Teamsters Chauffeurs & Helpers Union, 346 U.S. 485, 74 S.Ct. 161, 171, 98 L.Ed. 228, it was said:

"For a state to impinge on the area of labor combat designed to be free is quite as much an obstruction of federal policy as if the state were to declare picketing free for purposes or by methods which the federal Act prohibits."

Here the picketing is prohibited when conducted for the purpose of obtaining something that is illegal under our statute. It, therefore, does not impinge on the area of labor combat designed to be free under the Taft-Hartley Act.

Reduced to its simplest terms the question may be propounded thus: Must the

state court refrain from protecting, maintaining and enforcing its declared public policy where there are also involved violations of the Taft-Hartley Act, such violations being entirely different than those involved under the state law? Did the Congress intend that the states under those circumstances be dependent upon enforcement of their policy by the provisions of the Taft-Hartley Act by federal action? The right to work in the sense of our statute cannot be protected by that act. Nor was it meant to be.

In Weber v. Anheuser-Busch, Inc., 348 U.S. 468, 75 S.Ct. 480, 486, 99 L.Ed. 546, the court said:

"In Allen-Bradley Local, etc. v. Wisconsin Employment Relations Board, 315 U.S. 740, 62 S.Ct. 820, 86 L.Ed. 1154, the State was allowed to enjoin mass picketing, threats of bodily injury and property damage to employees, obstruction of streets and public roads, the blocking of entrance to and egress from a factory, and the picketing of employees' homes. *The Court held that such conduct was not subject to regulation by the federal Board, either by prohibition or by protection.*" (Emphasis supplied.)

In other words, there was no conflict between the state law and the Taft-Hartley Act either prohibiting or protecting the conduct involved. The court also said in the same case:

"International Union, etc., v. Wisconsin Employment Relations Board, 336 U.S. 245, 69 S.Ct. 516, 93 L.Ed. 651, involved recurrent, unannounced work stoppages. The Court upheld the state injunction on the ground that such conduct was neither prohibited nor protected by the Taft-Hartley Act and thus was open to state control."

In the case of Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board, 336 U.S. 301, 69 S.Ct. 584, 93 L.Ed. 691, the state court forbid enforcement of a maintenance of membership clause in a contract between employer and union. Since there was nothing in the Wagner or Taft-Hartley Acts sanctioning or forbidding these clauses, they were left to the regulation of the state.

Since the state, under Section 14(b) is permitted to prohibit entirely closed and union shops, which has been done in this state, and since such prohibition does not conflict with any specific provision of the Taft-Hartley Act, and since this area is in the nature of an exclusion from the provisions of the Act, complete regulation, protection, maintenance and enforcement of this area must be left free to the state to make it effective.

Certainly it must be conceded that nowhere in the Taft-Hartley Act is there complete protection of the "right to work" such as is afforded under the declared public policy of the State of North Dakota, and therefore, there is no controlling and superseding federal power, or curtailment thereof by the state. This is so because the intervention is of a different nature than that which would be afforded under the Taft-Hartley Act.

Where, as here, such negotiations as were, and as found by the trial court, had for their main objectives the violation of the declared public policy of the State of North Dakota, the same could be enjoined because illegal under our law, and the state action does not conflict with the Taft-Hartley Act as no *equivalent protection* is afforded to the employers or laborers under the federal act as exists under the state law.

Furthermore, since under Section 14(b) the Taft-Hartley Act is not to be construed as authorizing the execution or application of agreements requiring membership in labor organizations as a condition of employment in any state or territory in which such execution or application is prohibited by the state or territorial law, *it must be implied as a necessary incident of the right to thus prohibit the execution and application of agreements providing for closed or union shop, that the state might* take whatever steps are necessary to secure maintenance, enforcement and protection of the law,

which would include a resort to the state court when the primary purpose of bannering and picketing is to secure an illegal contract contrary to provisions of the state law. There was certainly no object for enactment of Section 14(b) as a part of the Taft-Hartley Act if it merely means that the state may prohibit the execution and application of these agreements but may do nothing more.

The maintenance of our dual sovereignties under the federal and state constitutions demands that neither unduly encroach upon the other insofar as that can be avoided. Each is independent in its own sphere except as limited by state and federal constitutional provisions. The separation of powers under our dual system of government, state and federal, demands complete independence of actions of each within its proper sphere of governmental regulations, and a state should not be dependent for maintenance or enforcement of its public policy in labor relations, as determined by the North Dakota constitution and statutes, upon procedures or court action of the government of the United States. Undoubtedly that was the basis for the insertion of Section 14(b) in the federal act. The Virginia case, Local Union No. 10, United Ass'n of Journeymen, Plumbers, etc. v. Graham, 345 U.S. 192, 73 S.Ct. 585, 97 L.Ed. 946, recognizes that a state by its judicial process has a right to protect its declared public policy under the so-called right to work statutes. While interstate commerce may not have been involved in that case, where the area or field of action is exclusive to the state as indicated by Section 14(b) of the Taft-Hartley Act, the state courts must have the right to protect that policy whether interstate commerce is involved or not.

In the case of Matthews v. Rodgers, 284 U.S. 521, 525, 52 S.Ct. 217, 219, 76 L.Ed. 447, it was said:

"The scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts, and a proper reluctance to interfere by injunction with their fiscal operations, require that such relief should be denied in every case where the asserted federal right may be preserved without it."

This may be applied to the field of labor relations. It could never have been intended that a state might entirely prohibit agreements involving closed or union shop and make such agreements entirely null and void, and then be left powerless to take such steps as would make its policy effective; that its courts were without jurisdiction to maintain, enforce, or protect that policy where such enforcement would also preserve federal rights that might be involved.

I conclude that apart from any consideration of the police power, the state for compelling reasons, has the right to protect, maintain and enforce laws protecting the "right to work" regardless of membership or non-membership in a labor union, and that this was the primary purpose for which provision was made in the Taft-Hartley Act under Section 14(b), 29 U.S.C.A. § 164(b).

For reasons herein expressed as well as those set out in Judge GRIMSON'S opinion, the judgment should be affirmed.

MORRIS, Judge (dissenting).

This is an appeal from a judgment of the District Court of Williams County enjoining the defendants from picketing the construction site of a plant being built by the Signal Oil and Gas Company, a foreign corporation. The plaintiffs are construction contractors engaged in the performance of a contract entered into with the Signal Oil and Gas Company which is not a party to this action. The defendants are labor unions or officers or representatives of such unions.

The plaintiffs' complaint in part alleges that on the 19th day of August, 1953, at about nine a. m. they each received in the mail a request and notice as follows:

"A meeting has been arranged between the Contractors of the Tioga Gas Plant and Representatives of the Building and Construction Trades Council on Wednesday the 19th of Au-

gust at 10:00 in the morning at Signal Oil Company's Field House in Tioga.

"We request that a representative from your company attend this meeting and that such representative have the authority to make a final decision on important matters that might effect the entire job in the future."

It was signed "Minot Building and Construction Trades Council, Harold N. Olson, President." It is then alleged:

"That at ten o'clock A.M., on the 19th day of August, 1953, representatives of Plaintiffs informed Defendants that they had had no adequate notice, and that they were unable to discuss terms and conditions of employment with the Defendants, and that they had no proof that the Defendants represented their employees, and that therefore Plaintiffs could not enter into any negotiations with Defendants covering these employees. At approximately the same time, Defendants presented to Plaintiffs contracts which they desired Plaintiffs to execute, the force and effect of which were to require Plaintiffs to discharge their employees and employ members of the Defendants unions, or to enforce or coerce their employees to join Defendants unions. A copy of one of these instruments, marked Exhibit 'C' is annexed hereto and made a part hereof."

The complaint then sets forth that the plaintiffs refused to execute these agreements and the defendants began to picket and banner the plant site of Signal Oil and Gas Company on Friday, August 21, 1953, and that the picketing has continued to the irreparable damage of the plaintiffs. It is further alleged:

"The purpose of the picketing and bannering of the plant is to enforce a boycott against these Plaintiffs and to force Signal Oil and Gas Company, Inc. to terminate its contract with them, and to render them unable to perform their contract, and to force and coerce Plaintiffs to force and coerce

their employees to join Defendants unions under threat of being discharged and being replaced with employees supplied by Defendants unions."

The complaint also sets forth in some detail the injurious effect on plaintiffs' operations that resulted from the picketing and asks for both a temporary and a permanent injunction.

The defendants' answer contains a general denial and specifically denies that the purpose of any bannering or picketing by any defendant was as stated in the complaint. The answer also alleges:

"that a labor dispute exists between plaintiffs and defendants and that the court is therefore without jurisdiction to grant the relief requested in the complaint and moving papers herein. * * *

"that if there is a proceeding pending before this court, the same is covered by the provisions of the Labor Management Relations Act, 1947, and this court is, therefore, without jurisdiction over said subject matter."

The court first issued a temporary injunction and after a trial was had rendered judgment decreeing that the defendants individually and collectively, their employees, servants and representatives, and any other person acting in aid or assistance of the defendants

"be and they are and each of them is hereby restrained and enjoined permanently and perpetually either directly or indirectly or by any means or methods from doing or attempting to do any of the following described acts:

"Picketing, bannering, or boycotting either the Plaintiff Oil Field Service Co., Signal Oil & Gas Co., or any of the engineers, contractors or employees of Signal Oil & Gas Co. or the plant site, warehouse, tracks, team tracks, vehicles, roads or other facilities of the Plaintiff, Oil Field Service Co. or Signal Oil & Gas Co., Inc., used or useful in connection with the natural gasoline

and sulphur extraction plant of Signal Oil & Gas Co., Inc. adjacent to the city of Tioga, North Dakota, by:

"(1) Using cameras, pencil and paper, or other means ostensibly to record the identity of persons and vehicles engaging in business intercourse with Plaintiff Oil Field Service Co. in effecting ingress and egress to and from the plant site;

"(2) Maintaining a rotating picket line back and forth, across, and directly in front of the plant entrances;

"(3) Engaging in any picketing, bannering, or boycotting by any and all other coercive measures which, if prolonged, is calculated or likely to intimidate persons engaged or undertaking to engage in business intercourse with plaintiff or induce violence."

The defendants appeal from this judgment and demand a trial anew in this court.

It is stipulated that the work being performed for and by the plaintiffs under their contract with the Signal Oil and Gas Company affects interstate commerce within the meaning of the Constitution of the United States and the Labor Management Relations Act of 1947 which will be hereinafter referred to as the Taft-Hartley Act.

The overall issue is whether the conduct of the defendants that has been enjoined falls within the province of the National Labor Relations Board as allocated to it by the Taft-Hartley Act to the exclusion of state jurisdiction.

"A State may not enjoin under its own labor statute conduct which has been made an 'unfair labor practice' under the federal statutes. Such was the holding in the Garner case, supra. [Garner v. Teamsters, Chauffeurs Union, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228.] The Court pointed out that exclusive primary jurisdiction to pass on the union's picketing is delegated by the Taft-Hartley Act to the National Labor Relations Board." Weber v. Anheuser-Busch, Inc., 348 U.S. 468, 75 S.Ct. 480, 485, 99 L.Ed. 546.

We must determine whether the conduct of the defendants in this case has been made "an unfair labor practice" under the Taft-Hartley Act. Plaintiffs' employees are not unionized. In an informal poll the majority of the employees expressed a preference for nonunion status. None of the defendants have been certified as a bargaining agency for the employees by the National Labor Relations Board. No election has been held for the selection of a bargaining agency as provided by Title 29 U.S.C.A., § 159.

Despite the fact that the defendants had no authority to bargain for or in behalf of plaintiffs' employees they demanded that the plaintiffs recognize them as bargaining agents and enter into contracts with the various defendants regarding membership, wages, hours, and working conditions pertaining to employees performing work in various building trades represented by the defendant unions.

The Minot Building and Construction Trades Council called a meeting on August 19, 1953, at which they requested the presence of a representative from each of the plaintiffs. The plaintiffs were not represented at the meeting. Signal Oil and Gas Company was represented by Lloyd Miller who was in charge of the construction of the Tioga plant. He testified at length as a witness for plaintiffs. He stated that the representatives of the unions explained the purpose of the meeting, which was to negotiate a contract with Oil Field Service Company and Diederich and Bye to employ union help in the performance of their job and that they wanted Miller to negotiate a contract. He told the representatives of the defendants that he had no authority to interfere with the internal operations of the plaintiffs. The defendants asked him to intercede in behalf of the unions and he advised them that it was not his place to do so. He also stated that they wanted him to negotiate a contract with the plaintiffs. He said: "I received samples from the different crafts of contracts that they wanted to ne-

gotiate." Miller also testified that the representatives of the defendants wanted him to either stop the work or induce the plaintiffs to negotiate a contract immediately and that "the Minot Labor Council had already authorized the representatives of that group to banner our job if an acceptable contract was not arranged for between the contractors and the respective unions."

The plaintiffs introduced in evidence several of these contracts, among them being the contract referred to in and attached to plaintiffs' complaint. This contract is Exhibit D. It was proffered on behalf of Local Union Number 714, International Brotherhood of Electrical Workers. It was strictly a closed shop contract as disclosed by these paragraphs:

Article 2. "Sec. 3. The Employer shall employ only members in good standing of the Union on all electrical work; should however, the Union be unable to furnish the Employer with workmen within 48 hours of the time the Union or its representative receives the request, the Union shall issue temporary working cards to workmen who apply and are acceptable to both parties until such time as the Union can furnish workmen. Any such workman shall receive at least the minimum wages and work under the conditions of this agreement."

Article 3. "Sec. 9. Apprentices shall be registered with the Union before being put to work. Apprentices must sign an apprenticeship application and appear before the Joint Apprenticeship Committee for interview. All apprentices shall be governed by the standards and rules established by the Joint Apprenticeship Committee."

Another contract, known in this record as Exhibit G, was submitted on the printed form of the Minot Master Plumbers and Plumbers and Pipefitters Local 627 and contained the following clause:

"Whenever, after reasonable notice, which shall be defined as forty-eight (48) hours, the Local is unable to fur-

nish a sufficient number of duly qualified men to meet the necessary requirements of the employer, then the employer may secure from other sources such additional qualified men as may be necessary; provided that it be understood that such additional men shall become a party to this agreement before thirty (30) days have expired."

This clause seems to indicate that the contract is a union shop or union-security agreement rather than a strictly closed shop contract. See National Labor Relations Board v. National Maritime Union, 2 Cir., 175 F.2d 686.

With respect to the Signal Oil and Gas Company for whom the plant was being constructed, the trial court found:

"The Defendant labor unions demanded that Signal as owner of the gasoline extraction plant being constructed, compel the Plaintiffs and each of them to enter into agreements for the employment of members of the Defendant unions only on the construction of that plant, under agreements substantially in the form of the agreement which is Plaintiffs' Exhibit 'D'."

The trial court also reached this conclusion:

"That the Defendants sought by means of picketing, bannering and boycotting to coerce and induce employees of carriers transporting commodities and other materials to the plant site of Signal Oil and Gas Company, among other persons, to engage in a concerted refusal in the course of their employment to transport or otherwise handle materials or commodities consigned to the plant site, the object thereof being to force or require Signal Oil and Gas Company to cease doing business with the Plaintiffs."

"That the picketing, bannering and boycotting carried on by the Defendants for the purposes mentioned in the preceding paragraph was an unfair labor practice as defined by Sec. 8(b), paragraph 4 of the Labor Manage-

ment Relations Act of 1947." 29 U.S. C.A. § 158(b)(4).

It is an unfair labor practice under the Taft-Hartley Act for an employer

"by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made and has at the time the agreement was made or within the preceding twelve months received from the Board a notice of compliance with section 159(f), (g), (h) of this title, * * *." 29 U.S.C.A. § 158(a)(3).

It is an unfair labor practice for a labor organization or its agents

"to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section * * *." 29 U.S. C.A. § 158(b)(2).

It is also an unfair labor practice for a labor organization or its agents

"to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; (B) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title; (C) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 159 of this title; * * *." 29 U.S.C.A., § 158(b)(4).

Thus it is an unfair labor practice for an employer by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization and it is equally an unfair labor practice for a labor organization to force or require an employer to do so or to recognize or bargain with a labor organization as the representative of his employees unless that labor organization has been certified as the representative of the employees by the National Labor Relations Board.

In this case the defendants demanded that the plaintiffs bargain with the defendants and enter into union security contracts with them. The demands included a closed shop contract on the part of at least one defendant and a contract containing a preference and referral clause on the part of another. The closed shop contract would if entered into have been of itself a violation of the Taft-Hartley Act and no union contract could lawfully be entered into under the Taft-Hartley Act except with a certified bargaining agent of the employees. Thus the entire demand upon Signal Oil and Gas Company and upon the plaintiffs

was an unfair labor practice. The form of the contracts, however, is not of great importance. The controversy never reached the point where actual bargaining took place and no specific contract was demanded of either the plaintiffs or the Signal Oil and Gas Company. The forms submitted were specimens which the defendants hoped to use as a basis for bargaining.

In some of the specimen contracts it was specifically provided that "The Contractor recognizes the Union as the exclusive bargaining agents of its employees who are covered by this agreement." In others the position of the defendants as bargaining agents was clearly implied.

On August 21, 1953, the defendant unions acting jointly and through the defendant Building and Construction Trades Council set up a rotating picket line at the entrances to the plant site of the Signal Oil and Gas Company. Pickets carried banners bearing the legend: "This Project Unfair to Organized Labor." None of the pickets were employees of the plaintiffs.

During the trial many controversies developed over the admission of evidence. Plaintiffs' attorneys repeatedly stated that they alleged and were attempting to prove that the defendants demanded closed shop contracts in violation of law. On the other hand, the avowed purpose of the defendants was to compel the plaintiffs to negotiate and enter into contracts with the unions. The witness Watts was a business representative of Iron Workers Local Union 708. He was also one of the representatives of the Building and Construction Trades Council in the attempt to negotiate. His direct examination concludes as follows:

"Q. Would you be willing to meet at any time with representatives of the Plaintiffs for the purpose of discussing this controversy? A. Yes, sir."

Arthur J. Johnson, a representative of the carpenters union for the State of North Dakota, testified that at the meeting of August 19, or at any other meeting that he attended with Mr. Miller, neither he nor any other representative of a union asked Mr. Miller to force either of the plaintiffs to enter into a contract that would require the employment only of union persons.

By ignoring entirely the evidence of the defendants the majority opinion reaches the conclusion that the sole purpose of the picketing was to compel Oil Field Service Company to enter into union contracts with the defendants in violation of the laws of North Dakota; that Taft-Hartley expressly permits states to prohibit the execution or application of agreements requiring membership in a labor organization as a condition of employment and therefore the state court has jurisdiction to enjoin picketing for the purpose of compelling the execution of such contracts. The solution is not that simple. Upon the whole record I conclude that the primary purpose of the picketing was to compel the plaintiffs to recognize the defendants as bargaining agents for their employees and to negotiate employment contracts with the defendants. The picketing was designed to bring this compulsion to bear indirectly through Signal Oil and directly through interfering with plaintiffs' operations at the plant site.

It is clear that the conduct of the defendants in picketing the plant site of Signal Oil and Gas Company constituted unfair labor practices under Section 8 of the Taft-Hartley Act, 29 U.S.C.A. § 158. It was designed to compel the plaintiff employers to bargain with defendants who were not authorized to represent the employees and by discrimination in regard to hire and tenure of employment to encourage membership in a labor organization. The picketing with respect to Signal Oil and Gas Company was for the purpose of exerting secondary pressure in furtherance of that design.

In point is the case of Local 74, United Brotherhood of Carpenters and Joiners of America, etc. v. National Labor Relations Board, 341 U.S. 707, 71 S.Ct. 966, 970, 95 L.Ed. 1309. In that case Stanley, who owned a dwelling house, contracted with Parker to improve and renovate it. Parker employed union men. A retail store called

"Watson's" contracted with Stanley, with Parker's implied consent, to install wall and floor coverings in the house. Watson's employed nonunion labor. In an effort to force the owner Stanley to cancel his installation contract with Watson's a union ordered a strike or concerted cessation of work on the part of union carpenters. The National Labor Relations Board found this conduct to be an unfair labor practice and was sustained by the supreme court, which said:

"As determined in the Denver case [National Labor Relations Board v. Denver Building and Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed 1284] it is enough that one of the objects of the action complained of was to force Stanley to cancel Watson's contract. It does not immunize such action from § 8(b)(4)(A) to show that it also had as an object the enforcement of a rule of the union that its members should not work on a project on which nonunion men were employed. The statute did not require the individual carpenters to remain on this job. It did, however, make it an unfair labor practice for the union or its agent to engage in a strike, as they did here, when an object of doing so was to force the project owner to cancel his installation contract with Watson's."

On the question as to whether conduct of the defendants comes within the jurisdiction of the National Labor Relations Board the decision in National Labor Relations Board v. Local Union No. 55, 10 Cir., 218 F.2d 226, 231, is helpful because of the similarity in facts. In that case the board had issued a cease and desist order against respondent unions. The Professional and Business Men's Life Insurance Company was engaged in a residential dwelling construction project. It acted as its own general contractor and as such employed skilled workers and laborers. In addition it contracted with various subcontractors to perform specialized construction work. Several subcontractors had signed collective bargaining contracts with building trade unions. The insurance company operated an open shop with respect to its own employees. This resulted in a controversy with unions that objected to having union members work alongside nonunion men. None of the respondent unions were certified bargaining agencies for insurance company employees. In a poll employees of the insurance company voted against one of the respondent unions as their bargaining agent.

Being unsuccessful in their efforts to force the insurance company to sign a collective bargaining agreement, the respondents placed the insurance company on their unfair list and picketed the construction site.

In determining that the facts and the law afforded a sound basis for the order of the board, the court said:

"Here, at the common situs, construction work was being carried on by the Insurance Company, the primary employer, and by certain subcontractors. The object of the picketing was to compel the Insurance Company to recognize one of the respondents as the bargaining agent for its employees and to cease working nonunion men alongside of union members. The picketing signs were not directed at the primary employer alone, but at the project, at which secondary employers were also working. It read: 'Working Conditions on This Job Unfair to Carpenters' District Council.' It is a reasonable inference from the evidence that a primary purpose of the picketing was to cause the employees of the subcontractors to cease working on the project and prevent the subcontractors from completing the construction under their subcontracts, as a means of compelling the Insurance Company to recognize one of the respondents as the bargaining agent for its employees and to cease working nonunion men on the project. That was the only way that the respondents could accomplish their objectives, so long as union employees of the subcontractors were willing to

work on the project with nonunion employees of the Insurance Company and the nonunion employees of the Insurance Company were unwilling to recognize either of the respondents as their bargaining agent and to become members of the Union.

"We conclude that under the undisputed facts and the reasonable inferences deductible therefrom, which it was the peculiar province of the Board to determine, the Board was fully warranted in concluding that the picketing was designed to create pressures that would cause the subcontractors to stop the work on their subcontracts with the Insurance Company, as well as to compel the Insurance Company to recognize one of the respondents as the bargaining agent of its employees. We think that conclusion must follow, when consideration is given to the pressure that had theretofore been directed at the secondary employers, the purpose of which plainly was to induce them to cease doing business with the primary employer and thus compel the latter to unionize its employees and recognize the respondents as their bargaining agent.

### "The 8(b) (2) Violations

"Section 8(a) (3) of the Act makes it an unfair labor practice for an employer by discrimination, in regard to hire or tenure of employment, or any term or condition of employment, to encourage or discourage membership in any labor organization, except insofar as permitted by a valid union-security agreement. By § 8(a) (3) (i) of the Act, the employer is forbidden to enter into a union shop contract with a labor organization, unless such labor organization 'is the representative of the employees as provided in Section 9(a), in the appropriate collective-bargaining unit covered by such agreement when made'. Neither of the respondents was the representative of the employees of the Insurance Company as provided in § 9(a) of the Act.

"The question presented is whether the respondents, by demanding and using pressure to enforce their demands that only members of the Union be employed on the Insurance Company's project, attempted to cause the Insurance Company to discriminate against nonunion employees in violation of § 8(a) (3) of the Act, thereby violating § 8(b) (2) of the Act. The evidence established that the respondents repeatedly endeavored, both through direct and indirect pressures, to induce the Insurance Company to abandon its open shop policy and employ only members of the respondents, and that in the midst of such pressures the respondents urged the Insurance Company to sign a collective bargaining contract which was tantamount to a closed shop agreement and an illegal union-security agreement.

"The respondents contend that their demands upon the Insurance Company would not have required the dismissal of any of its employees currently on the job. Certainly, the objective of the respondents was to compel the Insurance Company to cease employing nonunion men, including both its present and its future employees. But, if the demands of respondents went only so far as they contend, they would still have been a violation of § 8(b) (2) of the Act. That section proscribes union attempts to cause discrimination based on union membership, not only against specific employees, but also against potential employees. The 'prohibition is not confined to those instances in which specific non-union employees are unlawfully discriminated against. It extends as well to instances in which the union, or its agents, seeks to cause the employer to accept conditions under which any non-union employee or job applicant will be unlawfully discriminated against.' [N. L. R. B. v. National Maritime Union, 2 Cir., 175 F.2d 686.]" See also Piezonki v. National Labor Relations Board, 4 Cir., 219 F.2d 879.

It is contended on behalf of the plaintiffs that despite the fact that the conduct of the defendants amounted to unfair labor practices under the Taft-Hartley Act a state court has jurisdiction and power to enjoin the acts and conduct of the defendants in picketing the plant site of the Signal Oil and Gas Company for two reasons. The first is that because of the provisions of Chapter 120, Section 14(b), 61 U.S.Statutes, p. 151, 29 U.S.C.A. § 164(b), and the laws of North Dakota, to which we will later refer, an exception to the Taft-Hartley Act is created under which a state court may enjoin the acts and conduct of the defendants; and the second is that a state court may enjoin the acts and conduct of the defendants under the police powers of the state.

Chapter 120, Section 14(b), 61 U.S.Statutes p. 151, 29 U.S.C.A. § 164(b), provides:

"Nothing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law."

Section 34–0114, NDRC 1953 Supp. provides:

"No person shall be deprived of life, liberty or property without due process of law. The right of persons to work shall not be denied or abridged on account of membership or nonmembership in any labor union or labor organization, and all contracts in negation or abrogation of such rights are hereby declared to be invalid, void and unenforceable."

Under this section of the state law both closed shop and union shop contracts are void and unenforceable.

The record does not warrant the conclusion that the picketing was solely for the purpose of forcing or requiring the plaintiff employers to execute contracts falling in either category. If we should assume

that it did include among its purposes that of securing a union contract the conduct of the defendants in this case would still come within the definition of "unfair labor practice" defined in 29 U.S.C.A. § 158(b) (4) because none of the defendant unions had been certified as a representative of the employees under 29 U.S.C.A. § 159.

The decision in Garner v. Teamsters, Chauffeurs & Helpers Local Union No. 776, 346 U.S. 485, 74 S.Ct. 161, 164, 98 L.Ed. 228, is particularly applicable here. That case involved employers engaged in interstate commerce. No labor dispute or strike was in progress. The respondents established a rotating picket line at the employers' loading platform. None of the pickets were employees of the employers. They carried banners reading: "Local 776 Teamsters Union (A. F. of L.) wants Employees of Central Storage & Transfer Co. to join them to gain union wages, hours and working conditions." The picketing was peaceful but drivers for other carriers refused to cross the picket line and thus hampered interchange of freight with unionized concerns which drastically reduced the business of the employers. The courts below found that the purpose of the picketing was to coerce the employers into compelling or influencing their employees to join the union. The court said:

"This is not an instance of injurious conduct which the National Labor Relations Board is without express power to prevent and which therefore either is 'governable by the state or it is entirely ungoverned.' * * *

"Congress has taken in hand this particular type of controversy where it affects interstate commerce. In language almost identical to parts of the Pennsylvania statute, it has forbidden labor unions to exert certain types of coercion on employees through the medium of the employer. It is not necessary or appropriate for us to surmise how the National Labor Relations Board might have decided this controversy had petitioners presented it to

that body. The power and duty of primary decision lies with the Board, not with us. But it is clear that the Board was vested with power to entertain petitioners' grievance, to issue its own complaint against respondents and, pending final hearing, to seek from the United States District Court an injunction to prevent irreparable injury to petitioners while their case was being considered. The question then is whether the State, through its courts, may adjudge the same controversy and extend its own form of relief. * *

"We conclude that when federal power constitutionally is exerted for the protection of public or private interests, or both, it becomes the supreme law of the land and cannot be curtailed, circumvented or extended by a state procedure merely because it will apply some doctrine of private right. To the extent that the private right may conflict with the public one, the former is superseded. To the extent that public interest is found to require official enforcement instead of private initiative, the latter will ordinarily be excluded. Of course, Congress, in enacting such legislation as we have here, can save alternative or supplemental state remedies by express terms, or by some clear implication, if it sees fit.

"On the basis of the allegations, the petitioners could have presented this grievance to the National Labor Relations Board. The respondents were subject to being summoned before that body to justify their conduct. We think the grievance was not subject to litigation in the tribunals of the State."

The Garner case was recently followed in Texas Const. Co. v. Hoisting and Portable Engineers' Local Union, 178 Kan. 422, 286 P.2d 160.

The plaintiffs rely extensively on Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board, 336 U.S. 301, 69 S.Ct. 584, 93 L.Ed. 691. This case did not involve a strike or picketing. It involved the application of a contract prohibited by state law. A provision in a state employment law made it an unfair labor practice for an employer to enter into an all union agreement with the representatives of his employees unless approved by the specified majority of the employees. The company entered into such an agreement with a union without securing the approval of the required number of employees. An employee who refused to pay dues was discharged at the request of the union. The Wisconsin board ordered his reinstatement and compensation of loss of pay on the ground that the maintenance of membership clause was violative of the Wisconsin statute. Its action which was upheld by the court was taken pursuant to a state law that had been violated in a manner coming within the terms of Section 14(b) of the Taft-Hartley Act which I have quoted above. That disclaimer does not include the act of picketing as such or the secondary boycott. We must bear in mind that the injunction in this case was directed at the act of picketing and not the execution or application of a contract prohibited by state law.

Local Union No. 10, United Ass'n of Journeymen, Plumbers, etc. v. Graham, 345 U.S. 192, 73 S.Ct. 585, 97 L.Ed. 946, is not in point.

"The basic question here is whether the Commonwealth of Virginia, consistently with the Constitution of the United States, may enjoin peaceful picketing when it is carried on for purposes in conflict with the Virginia Right to Work Statute."

Interstate commerce was not involved. There was no question of conflict between federal and state jurisdiction.

The first and primary purpose of the picketing was to force the plaintiffs to bargain with the defendant unions who were not certified bargaining agencies by directly hampering the plaintiffs in the performance of their construction contract with Signal Oil and Gas Company and by exerting secondary pressure on the plaintiffs through

Signal Oil and Gas Company to force the plaintiffs to bargain with the defendants and execute union security contracts with them. The point of bargaining was never reached either before or after the establishment of the picket line. Granting that a subordinate purpose of defendants' conduct was to secure contracts, the execution and application of which were prohibited by state law and which were also unlawful under the Taft-Hartley Act, this purpose does not remove the conduct of the defendants from the area of control of the National Labor Relations Board and place it within the jurisdiction of the state courts.

The power to prevent acts of picketing that are in violation of the Taft-Hartley Act and do not contravene the general police power of the state rests exclusively in the National Labor Relations Board. The fact that the picketing may also violate state law does not impinge upon that power. Capital Service, Inc. v. National Labor Relations Board, 9 Cir., 204 F.2d 848.

"Controlling and therefore superseding federal power cannot be curtailed by the State even though the ground of intervention be different than that on which federal supremacy has been exercised." Weber v. Anheuser-Busch, Inc., 348 U.S. 468, 75 S.Ct. 480, 487, 99 L.Ed. 546.

National Labor Relations Board v. White Construction & Engineering Company, 5 Cir., 204 F.2d 950, 953, involved a petition to enforce an order of the National Labor Relations Board requiring the employer to bargain with a named union as the accredited representative of the employer's fabricating shop employees. The employer contended:

"that because the union's business agent is demanding a 'union shop' agreement with the employer which has the effect of requiring respondent's employees to eventually join the union, the whole proceeding violates the spirit of the 'Right to Work' provisions of section 12 of the Declaration of Rights

of the Florida State Constitution, F.S.A., adopted November 7, 1944. The section in effect provides that the right of persons to work shall not be denied or abridged on account of membership or non-membership in any labor union. In this connection respondent points to section 14(b) of the Act, 29 U.S.C.A. § 164(b), which provides that 'Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.'"

In discussing this contention the court said:

"Even if this provision is applicable here, and pretermitting the fact that the question is raised by an employer and not by an employee whose right to work would be affected, there is nothing in either of these provisions which relieves respondent of its duty to bargain with the duly accredited bargaining representative. These matters, if relevant at all, would pertain only to the kind of contract to be negotiated. It is the employer's duty to negotiate in good faith, even though the parties are unable to agree on a contract, N. L. R. B. v. American Nat'l Ins. Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027; N. L. R. B. v. Mayer, 5 Cir., 196 F.2d 286."

Thus the court reached the conclusion that although the union was demanding a union shop agreement contrary to the right to work provisions of the Florida Constitution the demand related only to the kind of contract to be negotiated and it was the duty of the employer to bargain despite the provisions of Section 14(b) of the Taft-Hartley Act, 29 U.S.C.A. § 164(b), and the National Labor Relations Board had the power to require the employer to bargain. By analogy it would seem that in the case before us that the demands for a union shop which was contrary to our state law

does not preclude the National Labor Relations Board from acting under the Taft-Hartley Law.

61 U.S.Statutes, p. 151, Chapter 120, Section 14(b), 29 U.S.C.A. § 164(b), does not afford an exception to the application of the Taft-Hartley Act so as to deprive the National Labor Relations Board of jurisdiction over the acts and conduct of the defendants here involved and thus permit a state court to exercise jurisdiction over and enjoin such acts and conduct.

The trial court felt that the conduct of the defendants warranted the granting of plaintiffs'. application for an injunction under the general police powers of the state. A similar question was considered in Allen-Bradley Local, etc. v. Wisconsin Employment Relations Board, 315 U.S. 740, 62 S.Ct. 820, 86 L.Ed. 1154. In that case a cease and desist order of the state board was upheld under the police power of the state and as not being repugnant to the provisions of the National Labor Relations Act. The order was held to be within the proper exercise of the state's police power to prevent mass picketing of the employer's factory, threatening injury to employees or their property, obstructing or interfering with entrance to or egress from the factory, obstructing or interfering with the use of public streets, roads, and sidewalks, and picketing the domiciles of employees. In this case the only evidence of the conduct of the pickets other than maintaining a rotating picket line and carrying banners comes from the witness Cook, field construction engineer for Signal Oil and Gas Company, who stated that on the first two mornings and through the day there were men at the front gate with cameras around their necks who seemed to be taking pictures of cars and drivers coming through the gate and one or two other persons were taking down license plate numbers. The latter activity continued almost every day that the pickets were there. There appears to have been no acts or threats of violence. There is no evidence that anyone was disturbed by this activity or deterred from the purposes in which they were engaged. The facts here disclosed do not warrant the exercise of the police power of the state or justify its invocation by a state court as a ground for injunctive relief.

BURKE, C. J., concurs.